Colquitt and others *vs.* Howard.

[1.] Persons owning lands as tenants in common, are incorporated for the purpose of selling the lands held in common, and making improvements thereon, and the charter is accepted: *Held*, that the title to the property vests in the corporation, and that one of the tenants cannot maintain a suit to enjoin a trespass on the same, and that the corporation alone can sue.

[2.] *Held*, also, that one of the original tenants cannot maintain a suit to enjoin a breach of covenant entered into by a purchaser from the corporation, of portions of such land, with the corporation.

[3.] Persons exercising the corporate powers of a corporation may, in their character as trustees, be held liable in a Court of Chancery, for a fraudulent breach of trust; and a stockholder, in a case where the directors collude with others who have made themselves liable by negligence or fraud, and refuse to prosecute; or when they are necessarily parties defendants, may file a bill on his account and in behalf of the other stockholders; in such a case, the corporation must be made a party defendant.

In Equity, in Muscogee Superior Court. Decision on demurrer, by Judge Iverson, May Term, 1852.

The questions decided in this case, arose from a demurrer to the bill filed by John H. Howard. The material allegations in that bill were as follows:

In 1840, the Mayor and Council of Columbus were authorized by an Act of the Legislature, to define the limits of Bay street, and to lay off a portion of said street and of the North Common, into water lots, and to dispose of the same. The lots were laid off, thirty-six in number, and one-half of them, viz: the even numbers, 2, 4, 6, &c. were, by deed dated in 1841,

conveyed by the City Council to John H. Howard and Joseph Echols. One of the covenants in this deed was, that Howard & Echols should " erect a suitable, sufficient and well-constructed dam across the Chattahoochee river, terminating on the eastern bank, at any point on or above lot No. 1, &c. and to construct and form a safe and well-constructed canal or race, extending from said dam through all the said lots; said dam to be so high, and said canal or race to be so capacious, that when said river falls to the lowest height at which it usually stands in very dry weather, all the water of said river may, as it runs down, pass through said canal or race, and keep said dam or race in good repair," the said lots and improvements, &c. to be liable for any damages which may arise from a failure to comply with this covenant.

In 1843, the City Council, by deed, conveyed all of the odd numbers of said lots (except No. 1,) to John H. Howard, individually, the deed containing the same covenant, with the former deed to Echols & Howard.

Immediately thereafter, Howard and Echols entered into an agreement, whereby Echols relinquished to Howard, his one-half interest in the lots first purchased, and in lieu thereof, accepted an interest of one-fourth in all the lots conveyed by both deeds. One undivided half of all the lots was afterwards sold to Farish Carter and John B. Baird, and one undivided fourth retained by Howard & Echols, each; Echols' portion being conveyed to one Jeter, as trustee for Echols—the truth being, as complainant believed, that Walter T. Colquitt, through Jeter, advanced the money necessary to carry on Echols' share of this work, and the title to the property remained in Jeter for the security of Colquitt; Echols all the while controlling and directing the work.

In 1845, Jeter, Carter, Baird and Howard, were incorporated by an Act of the Legislature, under the style of the "Water Lot Company of the City of Columbus." This charter, in a preamble, stated the history and condition of the Company, and then, "in order to enable the said Howard and his associates, owners of said water lots, to conduct their affairs, and to carry

on their operations with greater facility," enacted, that they be incorporated under the style aforesaid, and be " capable in law, to have, hold, purchase, receive, possess, enjoy and retain to them and their successors, lands, rents, tenements, &c. of whatsoever nature, kind or quality, the same may be, and the same to sell, grant, &c." together with the usual corporate powers of suing, having a seal, &c.

The 2nd section of the charter provided for a President and Board of Directors, and provided that " the death of one or more of the Directors or parties in interest, shall at no time, or in any case, prevent or hinder or delay a sale or sales of the said lots, or any of them, or an interest therein, by the survivors in the name of the corporation."

The 3d section conferred power on the President to make certain contracts, " not appertaining to real estate, or an interest therein."

The 4th section provided a mode for the authentication of the contracts of the corporation.

The 5th section imposes an individual liability upon the stockholders, and limited the indebtedness of the company to one-half its capital stock.

Section 6 was the usual repealing clause.

On 16th February, 1847, the Water Lot Company conveyed to Wm. Brooks, lot No. 15, also a lot of land adjoining the race, in which deed it was covenanted, that Brooks, his heirs and assigns should be confined and restricted to the privilege of erecting and running a saw mill, or saw mills, on said piece of land, and should use only the water allowed to lot No. 15. Subsequently, Brooks and one John G. Winter, (who was equally interested in the purchase,) in violation of this covenant, erected on the said piece of ground, a large wooden building, three stories and a half high, in which, in addition to their saw mill, they placed in operation a large quantity of machinery, viz: turning lathes, machinery for making buckets, pails, &c. &c. &c. To arrest this violation of the covenant, the Water Lot Company filed a bill to enjoin them from farther prosecuting this work, known as the " Variety Works." The injunction was refused

by the Circuit Judge, and upon a writ of error this judgment was affirmed in the Supreme Court, on the ground that an adequate remedy at Law was open to the company, and on account of the delay in filing the bill until the work had been completed. Since that decision, suits at Law have been commenced for a breach of this covenant, which suits are still pending. Nevertheless, Brooks & Winter, emboldened by the decision of the Court, immediately commenced to make and erect another large building, adjoining the one already erected, not with a view to use it as a saw mill, but in execution of their previous purposes in violation of their covenant. The bill charged, that this building being filled with combustible material, was a nuisance, and that Winter & Brooks had also erected a kiln or brickhouse, near the race or canal, and upon one of the lots belonging to the Water Lot Company, in which lumber was placed to dry, which kiln was also a nuisance, exposing to the danger of fire all the surrounding buildings.

The bill farther charged, that the Water Lot Company commenced an action of ejectment against Stephen M. Ingersoll and Wm. Ingersoll, to recover so much of all of said water lots as lies west of the middle of the main channel of the river ; and also an action on the case for the waste of water from the dam on the west side of said river, which suits were still pending.

In 1850, Carter, Baird, Colquitt, and one Richard P. Spencer, purchased each from Brooks & Winter, one-fifth interest in the "Variety Works;" and also in a large quantity of lands lying on the Alabama side of the river and bounded on the east by the western lines of the said water lots, which was the land owned by Ingersoll, (and in virtue of which he claimed to the middle of the main channel of the river,) and sold by him to Brooks & Winter. In virtue of this purchase, Colquitt and his associates were to protect Ingersoll from Howard's interest, the suits by the Water Lot Company against Ingersoll, and the suits brought against Brooks & Winter were agreed to be settled without regard to complainant's rights or wishes. Farish Carter, in the mean time, transferred all of his interest in the Water Lot Company, to his two sons, Samuel N. and Benjamin F.

Carter, who made to Walter T. Colquitt a power of attorney to act for them.

In March or April, 1851, the western wall of the canal erected by the Water Lot Company, was broken by the flood arising from the heavy rains at that time. The parties in interest held a meeting and agreed that the wall should be repaired, and an agent appointed to superintend its erection. Complainant supposed the repairs were going on, when he learned that the repairs of the wall had been abandoned, and that Baird, and Colquitt acting for himself and as attorney for the Carters, assuming to be the Water Lot Company, together with Brooks and Spencer, the Howard Manufacturing Company, and the Eagle Manufacturing Company, (the two latter having purchased one nineteenth of the water power controlled by said canal, and having erected factories adjacent thereto,) contrary to the wishes of Howard, and without any order or resolution of the Water Lot Company, are now erecting a dam west of said canal wall, commencing at the west side of said wall, near its lower terminus, and running in a northwest direction at an angle of about 30 degrees from said western wall, until it reaches the dam running across the river—the effects of raising which dam would be, to render the repair of the western wall of the canal very expensive and troublesome, and to overflow a large portion of water lots, one-fourth of which belongs to complainant; to take away all power of shutting out the water from the canal; to injure and impair the value of the unsold lots, and in time of a flood would occasion a much greater quantity of trees and drift-wood to be deposited in said canal, to the damage of the whole property, and endangering the eastern wall of the canal. Another effect would be, to furnish those persons who have purchased lots increased water privileges without any compensation to the Water Lot Company, and to the injury of complainant's interest in the unsold water powers and privileges; and also, to furnish the proprietors of the Variety Works increased facilities for floating logs through the canal, and also increased water power to such an unlimited extent as would forever protect the Variety Works from suits by the other companies for using more water power than, by their covenant, they were allowed to

use. In the deeds conveying lots to the Howard and Eagle factories, the proprietors thereof covenant to bear their proportionate share of the expense of keeping up the walls of said canal. If the new dam is built, the bill charges that these proprietors will be relieved from this covenant.

The bill alleged that complainant has been the President of the Water Lot Company, ever since its organization under its charter; that he never assented to any of these acts, nor has the Company regularly acted, as he believes; that Echols agreed with complainant in his views and wishes, and he understands that Brooks did not consent to the acts of Colquitt.

The bill alleges that the injury will be irreparable, from the uncertainty of the damages, and from the inability to measure it in dollars and cents.

The prayer of the bill, that "an injunction be directed to the said defendants, requiring and enjoining said Brooks, Spencer, Colquitt, Baird, Samuel M. and Benjamin F. Carter, from permitting the said additional wooden buildings on said piece of ground so conveyed to Brooks, to remain on said piece of ground, and from permitting said machines or machinery, (other than a saw mill or saw mills,) to be run or kept in operation in said additional building, or to remain in the same; and also requiring and enjoining them from permitting said kiln or brickhouse to be used for the purpose for which it was erected; and from erecting it or any other upon any of said lots or ground, and from permitting said kiln or brickhouse to remain on any of said ground; and also restraining and enjoining the Howard Manufacturing Company, the Eagle Manufacturing Company, Colquitt, Baird, Brooks, Spencer, Samuel M. and Benjamin F. Carter, and Echols, from the erection of said contemplated dam, or any other west of the said canal," and further enjoining the co-corporators of complainant, from doing any act in the name of the Water Lot Company, affecting the interest of complainant in this property, and also from arresting, or attempting to arrest or delay the suits against Winter & Brooks and Ingersoll, and for general relief.

To this bill a demurrer was filed, among other grounds,

1st.  For multifariousness.

2d.  That Howard was not the proper party complainant, and could not maintain this bill—the injuries complained of being against the Water Lot Company.

Many other questions were brough*t* up by the writ of error, but the above alone, were decided in this *Court.*

The Court below overruled the demurrer.  That decision is brought up for review.

MOSES, for plaintiff in error.

BENNING and W. DOUGHERTY, for defendant in error.

*By the Court.*—NISBET, J. delivering the opinion.

We have no doubt but that this bill was demurrable for multifariousness.  We do not favor this ground of demurrer, but there are cases in which the principles of justice require it to be sustained.  This is one of them, as we think, easily demonstrable.  But inasmuch as the bill must go out of Court upon a ground of demurrer vitally effecting its legal merits, I shall confine the discussion to that ground.

[1.]  According to the view which we have taken of this cause, the complainant, Major Howard, has no right to sue as he has brought this suit, in his individual character.  The demurrer makes the question whether he has or not, for it asserts that "Howard was not the proper party complainant, and could not maintain this bill, the injuries complained of being against the *Water Lot Company.*"  The complainant represents himself as having an interest in certain water lots, originally purchased by himself and one Josephus Echols, of the City of Columbus.  In the deed from the City of Columbus to them, they covenant to erect a dam across the river, and to construct a canal on the line of the lots, so capacious as to receive all the water of the stream at low water, and to keep it in good repair ; and that the lots and the improvements thereon, and no other property whatever, should be liable for the damage which might grow out of

a breach.  He and Echols being at first proprietors of the whole, sold one-half of the property to Carter and Baird, he retaining one-fourth interest, and Echols the remaining one-fourth interest. He represents that himself and his co-tenants, were incorporated under the name and style of the *Water Lot Company of the City of Columbus*, for the purpose of more effectually carrying out their views in the sale of the property, constructing water-works, &c.  That the Company was organized under the charter, and he, himself, elected President, and that he continues to hold the office of President to the present time.  The bill farther charges, that the *Water Lot Company* sold to the defendant, Brooks, one of the lots belonging to them, and that the defendant, John G. Winter, was equally interested with him in the purchase; that Brooks covenanted with the company that this lot, and the water privileges connected with it, should be used alone for the purpose of a saw mill or saw mills, and contrary to the covenant, they had erected a large house thereon, and were engaged in the manufacture of various articles, such as buckets, pails, &c. &c. requiring a great deal of machinery, and the accumulation of lumber and other combustible material; that after a fruitless attempt by the Water Lot Company to enjoin them from such use of the land so bought by them, they had sold to Colquitt, Baird and Spencer, an interest in their manufactory; and that these proprietors, contrary to the original covnant, were proceeding to erect another large building for the purpose of conducting the said manufacture of the various articles aforesaid.  Of the erection and proposed use of this building, Howard makes complaint; charges that it is in violation of the covenant—that it will increase the risk by fire, of the property of the company, in which he has an interest, and prays that they be enjoined and restrained from the erection and use of the building for any purpose, save that of a saw mill.

He charges also, that these defendants had erected a kiln for drying lumber, on the line of the canal, upon property belonging to the Water Lot Company, so near to the other property of the company, in which he is interested, as greatly to subject it to

the danger of loss or destruction by fire, and prays that the use of this *kiln* may be enjoined, as being a nuisance.

The complainant farther charges, that the proprietors of the Variety Works, Brooks, Winter, Colquitt, and others, assuming to act as the Water Lot Company, but without authority from the company, and against the wishes of the complainant; together with the Eagle and Howard Manufacturing Company, the original dam and canal being broken by a flood in the river, were proceeding to construct a new dam and to open a new canal or race, for the purpose of affording the required supply of water to the different proprietors; that this new dam will cause the unsold lots of the company to be overflowed, increase the expense of keeping up a canal according to his original covenant with the City; will endanger the eastern line of the present canal; increase the supply of water to which the proprietors of the Variety Works are entitled by their contract with the company; and will release the obligation which the two manufacturing companies came under to pay their relative proportions of the expense of keeping up the canal. He charges that all of this is in violation of his rights, as the owner of one-fourth of the property of the Water Lot Company, and prays that they may be enjoined and restrained from the farther construction of this dam. All these several trespasses, he charges, are not capable of redress at Law; that the damages to him cannot be ascertained by proof, and will be irreparable. This statement covers the material parts of the bill. A large amount of matter, out of which grew some important questions, is intentionally omitted, as being irrelevant to the question upon which the decision is made.

[2.] Without saying whether the bill makes a case where Equity will interfere or not, we are clear, that for the injuries complained of, the *Water Lot Company* alone can sue. There are three distinct grounds of complaint in the bill, to wit: the erection of the building by Brooks, Winter and others, with a view to manufacturing purposes, the *kiln* for drying lumber, and the construction of a *new dam* across the *Chattahoochee.* All these are charged to be to the damage of the complainant, Howard·

*He*, in his personal character, asks relief by injunction.   He is the sole party complainant, and he grounds his right to relief upon his ownership of the one-fourth part of the unsold water lots.   So far as relief against the proprietors of the manufacturing establishment is sought, upon the score of a violation of their covenant, the complainant has no standing in Court, because they made no covenant with him, whatever.   Their undertaking was to the *Water Lot Company*—with that Company, and not with *Major Howard*, did they stipulate to use the lot which they purchased, alone for the purposes of a saw mill.   There is, therefore, no privity between them and the complainant, and without that he is not entitled to sue.   The same things may be said of the case, so far as the relief against the erection of the new dam depends upon the alleged release of the Eagle and Howard Manufacturing Companies from their obligation to pay their proportionable part of the expense of keeping the canal in good repair.   That obligation was assumed, not to *Howard*, but to the *Water Lot Company*.   But the proposition which covers the whole case is this: by accepting the act of incorporation, the title to these *water lots* vested in the corporation ; Major Howard's title to the one-fourth as tenant in common, was of course divested; and these things being so, no person can sue for the injuries done or anticipated, but the corporation.   That the Water Lot Company can sue for these trespasses, there is no doubt. *Angel and Ames on Corporations*, 312.   *Com. Dig. title Franchise*, (1 *Kyd.* 187.)   Whether Equity would grant relief, would depend upon the case made.   The Act was passed in 1845, and, it would seem, at the instance of the complainant and the other original purchasers of these lots.   They are named in the Act, and are declared to be a body corporate, by the name and style of the Water Lot Company of the City of Columbus.   They are clothed with the attributes of a corporation, such as the right to sue and be sued, the use of a common seal, succession, &c. &c.   The bill shows that these persons (the complainant and his associates) accepted the charter.   They accepted it by the election of officers, (Howard himself being elected President of the

Company,) by executing contracts and making deeds, and in-stituting suits in the corporate name.

And by accepting the charter, they assumed the obligations and became entitled to the privileges which it creates. They came under all the disabilities which it imposes, one of which, as I expect to show, is incapacity to sue for injuries to these lots in their individual characters. *Angel & Ames, on Corpora-tions,* 51, ' ·, '3, '4.   1 *Greenleaf's Me.* R. 79.   3 *T.* R. 240. 1 *Ibid,* 589.   3 *Barrow,* 1656.   2 *Dow & Clark,* 21.   7 *Bing.* 1.   7 *Dow & R.* 267.   4 *Barn. & C.* 781.   *Acts of* 1845, 123.

The preamble of the Act of 1845, recites the Act of the Le-gislature authorizing the City of Columbus to define *Bay street,* and to lay off *water lots* on its western boundary, and to sell the same.   It states, that John H. Howard and others, had become purchasers of these water lots, and refers to the improvements, to wit: the dam and canal, which they had covenanted to make ; and proceeds to declare, in order to enable the said Howard and his associates, owners of said water lots, to conduct their affairs and carry on their operations with greater facility, Be it enacted, &c. &c.

The Act gives to the corporation unlimited power to buy, sell and hold, real estate.   An exceedingly unwise grant, in my poor judgment.   It constitutes the parties in interest in the wa-ter lots, a *Board of Directors,* with power to appoint officers and to sell the lots, and prescribes the manner of executing titles to the same.   From all of which it is perfectly plain, that the proprie-tors of these water lots were created into a *corporation,* for the purpose of more easily vending and improving the water lots which they held in common.   These lots were the only capital stock of the company.   The interest which they held in them, became the value of the shares of each corporator.   No provis-ion is made for any other stock.   It is a private civil corpora-tion, based upon the water lots as its primary capital stock. The first object of the corporation, unquestionably was the *sale* of the water lots.   Now under all these enactments, under the charter and objects of this incorporation, who can doubt for a

single moment, but that when the charter was accepted, the title to the lots vested by operation of law, in the corporation, and that the original proprietors, instead of holding title as tenants in common, became the owners of an interest (call it stock if you please) in the entire capital, measured by the quantum of their interest originally in the lots. This was necessary to make the franchise at all available—this was indispensable to accomplish the object which the corporators had in view—for how could the corporation sell these lots without a title? Who would buy from them? Acting upon this view of the matter, we find that after the charter was accepted, all the sales were made by the corporation. Clearly, the title could not be in the original proprietors and in the corporation at one and the same time. A charter cannot be accepted partially, or conditionally, or for a limited time. If it is received but for an hour, it is conclusive and obligatory. *Angel & Ames,* 55. 4 *M.& S.* 255.

Resisting the idea that the title vested in the *corporation,* counsel rely upon the text of *Angel & Ames* to the effect, that the mere incorporation of tenants in common, does not vest the title, but a conveyance must be made by the individuals to the corporation. This is an incontrovertible proposition. But it contemplates a very different case from that before us. If a company of gentlemen are tenants in common of a body of land, and are incorporated for a definite object—as manufacturing, for example—the mere act of incorporation does not vest the title in the corporation, no more than it would vest the title of any one of them to his mansion-house. But if these tenants in common are incorporated for the very purpose of vending the land held in common, which is the very case in hand, I apprehend the result would be very different. The text of *Angell & Ames* is supported by the case of *Liffingwell vs. Elliot,* in 8 *Pick.* 455. Upon looking into that case, I find that several persons were tenants in common of seventy-five acres of land, and whilst so tenants, used it for the purposes of a manufacturing establishment. Afterwards, they were incorporated by Act of the Legislature. The Act makes no allusion to the land, but merely authorizes the company to hold real estate. The corporation was

organized agreeably to the Statutes of Massachusetts, regulating manufacturing companies, and the corporate stock was divided into a certain number of shares.   The *Supreme Court of Massachusetts*, under these circumstances, held that the *mere* incorporation of the tenants in common, to enable them to carry on more conveniently a common object, does not vest in the corporation a title to the land which they had previously used for the same purpose.   That Court could have made no other decision. How different is this case ?

Having established, as I must think conclusively, that the title to these lots vested by the charter and its acceptance, in the corporation, it needs no argument to show that it alone can sue for injuries to the corporate property.   If the *corporation* alone can sue, then Major Howard has no right to sue, and must go hence, without his cost.

It will be remembered that the complainant, Howard, covenanted with the City of Columbus, to build and keep in good order, a dam across the river Chattahoochee, and a canal of certain capacity described in the deed from the City to him and Echols, for these water lots.   It will also be remembered, that he charges in his bill that the construction of the new dam will greatly damage the canal, and thus visit him with liability on his covenant.   It might be claimed from these facts, that upon the score of his liability upon his covenant to the City, even if the title to these lots does vest in the corporation, he is entitled to bring this bill.   In looking into the covenant we find, that by express stipulation, the lots themselves, and the improvements put upon them, and no *other property whatever*, are made liable for any damage that may result from a breach of it.   This being the case, he is not personally chargeable on his covenant, and the property is chargeable in the hands of the corporation.   He, therefore, on the ground of the covenant, has no right to sue, and the corporation on that ground, has the right.

Again, the bill charges that Colquitt and his associates, *assuming to act as the Water Lot Company*, but without authority from the company and against the wishes of the complainant, are proceeding to construct the dam, which will damage him in the

Colquitt and others *vs.* Howard.

particulars before stated. It may be said that from this allegation it is inferable, that the pleader designed to charge these defendants, as *directors of the Water Lot Company*, with a fraudulent management of the affairs, and to restrain them from so doing farther. If, however, such was his purpose, which we do not believe, he has signally failed to make such a case as would give a Court of Chancery jurisdiction.

[3.] It is proper here to say, that whilst corporations are amenable to the Courts generally, according to the course of the Common Law, for the misuser or nonuser of their franchises, yet it is true, that the persons who are in the exercise of the corporate powers, may, in their character as trustees, be accountable to a Court of Chancery for a fraudulent breach of trust. If then, the directors of this, or any corporation, should refuse to prosecute, by collusion with those who had made themselves answerable by negligence or fraud, or if the corporation is still under the control of those who must be made defendants in the suit, the stockholders (or any one of them for himself and the others) who are the real parties in interest, may file a bill in their own names. In such a case, the averments in the bill should clearly and distinctly give jurisdiction, for Equity interferes with great caution with the Common Law jurisdiction over corporations. In such a bill, the corporation must be made a party defendant. Such a case as would give jurisdiction is not made in this bill; indeed as before stated, is not attempted to be made. *Attorney General vs. The Utica Insurance Company,* 2 *Johnson's Ch. R.* 389. *Robinson vs. Smith,* 3 *Paige R.* 222. *Ogden vs. Kip,* 6 *Johns. Ch. R.* 160. 3 *Atk. R.* 400. *Wood's Inst. B.* 1 *Ch.* 8 *p.* 110. 11 *Coke R.* 986. *Hichens vs. Congrove,* 5 *Rup. R.* 562. *Angell & Ames on Corp.* 251, 252.

Let the judgment be reversed.