No. 65.—JOSEPH E. KNOWLES and others, plaintiffs in error, *vs.* WILBORN J. LAWTON and others, defendants in error.

[1.] Merger does not, in general, take place when the person in whom the two estates meet, *intends* that it shall not take place.

[2.] [3.] If the holder of the equity of redemption takes an *assignment* of the mortgage, which is in the process of foreclosure, and *goes on with the suit of foreclosure*, his *intention*, it is to be presumed, is, that the equity of redemption shall not merge in the legal estate; and therefore, the equity of redemption does not merge in the legal estate.

[4.] A judgment foreclosing a mortgage, binds not only the mortgagor, but also his vendee—and this it does, although the vendee may not be a party to it.

[5.] The purchasers of parts of mortgaged property, have not the right to compel the mortgagee to resort, for his money, *first*, to the part of the property remaining in the hands of the mortgagor.

In Equity, in Baker Superior Court. Decision by Judge PERKINS, June Term, 1855.

The bill alleges, that on the 6th day of December, 1848, John L. Casey purchased of James Thomas, lots of land 281, 2d district Baker County; 5, 124, 324, 325, 326, 327, in the 7th district of said county; 325, 366, in the 8th district of said county; 45 in the 9th district; 73 in the 13th district of Early; 39, 287, 336, in the 26th district of Early; 95, 98, 148, 149, 182, in the 28th district of Early; and 146 in the 15th district of Lowndes, at the sum of $3.335$\frac{75}{100}$, for which sum Casey executed his note to Thomas, payable three years after date. Thomas conveyed the lands to Casey, and took a mortgage upon them to secure the payment of the note. This mortgage was recorded in Baker County, on the 13th day of December, 1848, seven days after it bears date; that on the 12th day of November, 1849, Nichols Boon purchased of Casey, without notice of the mortgage, lot of land No. 124, in the 7th district of Baker County, for the sum of forty dollars; and that Casey, by deed of that date, conveyed the land to Boon; that plaintiffs in error, without notice of the

mortgage in any way whatever, on the 31st of December, 1850, purchased No. 124, in the 7th district of Baker, together with another lot of land, for $550 (No. 124 being estimated, in the sale, at $150) from Boon, and took his conveyance therefor ; that on the 1st day of April, 1852, defendant, Lawton, being in possession of lot No. 281, in the 2d district of Baker, under a claim from some person pretending to hold title from Casey, which was acquired subsequently to complainant's title ; and being desirous to secure his title on the first, day of April, 1852, purchased of John L. Casey all the land embraced in the mortgage, with a full knowledge of the existence of the mortgage, and took his conveyance therefor, at the sum, as expressed in the deed, of $3.335—but, in fact, for a much less sum ; and if the deed was founded upon any consideration at all, it was upon the agreement that Lawton should stand in Casy's stead and take up the mortgage ; that although the deed was taken by Lawton, it was for the joint benefit of him and defendant, Cheever; that Lawton, to complete his title to lot No. 281, in 2d district of Baker County, together with Cheever, previous to the conveyance by Casey to Lawton, and before the April Term, 1852, of Baker Superior Court, purchased the note of Casey to Thomas, and took an assignment of the mortgage, and thereby the lesser estate merged in the greater, except as to complainant's lot of land and Nos. 5 and 7, in the 7th district of Baker County, conveyed by Casey on 12th November, 1849, to Francis Boatright; Nos. 325, 326 and 327, in the county and district last aforesaid conveyed, on 7th day of September, 1851, by Casey to John T. Moat; that the lot of land held by Lawton was worth, at his purchase, $2.500, and that he realized from its sale to William E. Collier, $3.125, or other large sum ; the balance of the lands, excluding those sold by Casey previous to conveyance to Lawton, being worth much more than the balance due on the mortgage debt, after deducting the value of the lot owned and held by Lawton ; that by means of the premises, the mortgage debt became and was extinguished ; and that after it was so extinguished, and after Casey had

parted with all his interest in the lands, Lawton and Cheever proceeded, at April Term, 1852, of Baker Superior Court, to foreclose the mortgage in the name of James Thomas; that at this term of the Court a *rule nisi* was granted, and being served by publication, was, at the October Term, 1852, made absolute; that execution issued upon the judgment of foreclosure, and was levied upon the mortgaged lands lying in Baker County, including No. 124, in the 7th district of Baker, the lot claimed by complainants.

That Joseph E. Knowles, one of complainants, interposed his claim to the lot, which claim is still pending on the appeal; that Boatright, previous to the sale in March, 1853, interposed his claim to the lands, conveyed by Casey to him, which is pending on the appeal; that his conveyance is of the same date as Casey's conveyance to Boon; that Washington D. Bailey interposed his claim to lot of land number 324, in the 7th District of Baker, under a title adverse to Thomas and Casey; that Thomas' title is the true title and the lot worth $1.500; that Bush interposed his claim to the lands conveyed by Casey to Moat, and which had been conveyed by Moat to Bush, which claim is also pending on the appeal, the lands worth $2.500; that. Clifton interposed a claim to lot of land number 366, in the 8th district of Baker County, worth $2.000, and held under an incomplete contract entered into with Casey subsequent to the sale to Boon, the contract not having been reduced to writing; that Clifton had partly executed the contract, by taking possession of the land and paying the whole or a part of the purchase money he had agreed to pay; that, previous to the sale in March, 1853, defendant, Cheever, was "let into the trade" upon terms unknown to complainant, but he, thereby, became jointly interested with Lawton in all the mortgaged lands, except 281, in 2d Baker, giving Lawton, to that extent, the advantage, by his voluntary relinquishment of his claim upon that lot of land, and to the extent of the value of that lot, committed a fraud upon complainants; that at the sale in March, 1853, Lawton and Cheever jointly purchased lot No. 45 in the 9th, and 325

in the 8th district of Baker County ; that Lawton became the purchaser of 281 in 2nd district of Baker County ; that the two lots bought by Lawton and Cheever were bid off at the nominal sum of $542 ; that competition was discouraged, from the fact that Lawton and Cheever, as the owners of the mortgage *fi. fa.* had a decided advantage over other bidders ; and that if such bidders desired to purchase the lands in future, they supposed that the fact of their running them upon Lawton and Cheever, would lessen their chances to procure them on as favorable terms.

That in consequence of a contract between Lawton and Collier, and to enable Lawton to execute his contract, it became indispensable that Lawton should purchase lot of land No. 281, in the 2d district of Baker, and that when it was exposed to sale, William Clifton commenced bidding for it so as to make it bring its value and satisfy the mortgage, that he might relieve from the incumbrance the property he held subject to it—and that Lawton entered into a fraudulent contract with him, to prevent him from running the land, agreeing to procure and protect Clifton's title against the mortgage to the lot of land he held, or give him such compensation therefor, as would be satisfactory to him ; that in pursuance of this understanding, Clifton ceased to bid, and the lot of land was knocked off to Lawton, at the sum of $300 ; that Cheever was present, knew the value of the land and assented to the sacrifice, and that this was a fraud upon the rights of complainant ; for that but for the arrangement, Clifton would have bid $2000 for the land, and Lawton would not have permitted it to have gone into the hands of any other person, at that price ; and that but for the arrangement with Clifton, he would have competed for the purchase of lot 325, in the 8th district, and would have made it bring $1000 ; that the mortgage *fi. fa.* was credited with the amount the land brought at the sale, when it should have been credited with the full value of the land ; that after the sale, and in pursuance of the contract with Clifton, Lawton and Cheever, on the 1st day of November, 1853, conveyed to him lot No. 325, in the

8th district of Baker County, worth $2000 or other large sum; gave him, also, $250 for his interest in the lot claimed by him; and that Clifton also relinquished his right, to Lawton and Cheever, to lot of land No. 366, in the 8th district of Baker County, and conveyed to them No. 398, in the 2d district of Dougherty County, a third and poor lot of land of the value of $250 or other small sum; that while these negotiations were going on, Clifton's claim to lot 366 was pending; and after they were consummated, it was withdrawn, and that the levy proceeded and the land was sold by the Sheriff, in July, 1854, and bid off, by Lawton and Cheever, at $700, it being greatly under its value, and that it sold for that sum in consequence of the previous arrangement with Clifton.

That Lawton and Cheever caused the mortgage to be foreclosed upon the lands in Early and Lowndes, and the lands to be sold under the foreclosure; that complainants do not know the prices or the purchasers of the lands, but were informed that they were bid off by Lawton and Cheever for much less than their real value; that by mistake, the claim was interposed in the name of Joseph E. Knowles, when it should have been made in the joint names of George and Joseph E. Knowles; that Thomas had parted with all his interest in the mortgage, before any proceeding was had to foreclose it, and that the proceedings were instituted by Lawton and Cheever, for the fraudulent purpose of preventing complainants, Boatright and Bush, from going in Equity and compelling them to resort, first, to the lands remaining in the hands of Casey, or in their hands, as the last purchasers from him, for the satisfaction of the mortgage; and in the event of the insufficiency of the lands to satisfy the mortgage, then to go upon the lands purchased by Boatright and Moat, in the inverse order of their purchase, and only for any balance that might thereafter remain upon the lot of land upon complainants.

The bill prays a discovery, that the foreclosure of the mortgage may be set aside and the sales thereon may be declared.

void; that Lawton and Cheever may account, and that the real value of the lands may be applied to the satisfaction of the mortgage; and that if the lands really owned by Casey, at the sale to Lawton, should be insufficient to satisfy the mortgage, then, that those sold by Casey may be sold for that purpose, in the inverse order of their dates, beginning with the last first. And an injunction against the sales under the mortgage *fi. fa.* was also prayed and granted.

To this bill, Lawton and Cheever filed their joint answer, in which they admit the sale from Thomas to Casey and the mortgage and debt from the latter to the former ; admit, also, the transactions between Casey and Boon, between Boon and complainants, between Casey and Moat, and Moat and Bush; deny that Lawton and Cheever made any purchase from Casey; or that the purchase made by Lawton from Casey, was for the joint benefit of Lawton and Cheever; but, on the contrary, was for the sole benefit of Lawton, to protect the title to lot of land number 281, in the 2d district of Baker, which he had previously purchased from Alexander B. Lawton, who had a bond for titles from one McGuire, who purchased one half of said lot from Casey on the 15th November, 1849, and took his deed to the same ; that when defendant, Lawton, called upon A. B. Lawton for his title to the lot of land, he produced the bond of McGuire, and turned it over to him; upon applying to McGuire, to make titles and take up the land, McGuire informed him that the land was subject to the mortgage, and that he had a deed only to one half of the lot; he also informed him that Thomas had promised him to release the land from the mortgage, upon the payment of $1.000. In the contract between defendant, Lawton, and A. B. Lawton, that lot having been rated at $1.150, it was understood between them and McGuire, that the bond should be delivered to McGuire, upon his turning over his deed from Casey to defendant, Lawton, which he did; that defendant, Lawton, should retain $1.000 of the purchase price of the land, and pay to A. B. Lawton $150, which was done; and

that defendant, Lawton, should, with the $1.000, release the land from the mortgage. Defendant, Lawton, denies that, at the time he procured the deed from Casey, he had any knowledge of the sale and conveyance to complainants; on the contrary, Casey told him he had only sold, of all the lands conveyed by Thomas to him, one half of lot No. 281, in the 2d district of Baker County, to McGuire. They say that Thomas refused to release the mortgage lien upon lot 281 for $1.000; and that, after this refusal and the conveyance by Casey to Lawton, defendants, Lawton and Cheever entered into a negotiation with Thomas for the purchase of the mortgage and debt it was given to secure; and shortly after, 15th November, 1852, the Attorney in fact of Thomas, closed the negotiation and assigned the mortgage and *debt* to defendants, Cheever and Lawton, they paying therefor the sum of $3.335 principal, with lawful interest thereon, and $179 fees due the Attorney, for services rendered in foreclosing the same. They admit they had notice of the conveyance of several lots embraced in the mortgage, before it was assigned to them; state that the equity of redemption was assigned to Lawton only, and that the mortgage was assigned to him and Cheever, jointly; deny that it ever was their intention to merge the mortgage in the fee, or that the equity of redemption and mortgage united in the same person.

They also deny that the lot purchased by Lawton, at the time of purchase, was worth $2500, but was only worth, then, what Lawton agreed to give for it, $1150 dollars, having then no improvements on it, except a well previously dug, and admits the sale of the lot by Lawton, as charged and for the price charged, its value having been enhanced from the improvements he put on it and from its connection with other lands included in the same sale; deny having instructed proceedings for the foreclosure of the mortgage, not having then procured the assignment, but became the owners of the mortgage at the period above stated; admit that Casey had no interest in the land when the proceeding was instituted; deny the fraud with Clifton as charged, and state the charge

to be utterly *false;* that Clifton bid for the lands, and was neither induced or persuaded by defendants not to bid; that they know nothing of the motives persons had not to bid for the lands, as the by-standers at the sale never informed them of their reasons; state that they were surprised at the small price which No. 281 brought at the sale, but attribute it to the fact, that the neighbors and others knew the trouble and expense Lawton had been at in procuring a title to it, and the sympathy they felt for him on that account; complainants, Knowles, Boatright, Bush and Bailey, their Attorneys, all attended the sale and had an opportunity to bid; deny all the allegations as to contract and combinations with Clifton, to prevent him from bidding; after the purchase of the mortgage by Lawton & Cheever, jointly, it was agreed between them that Lawton should take No. 281 at $1000, and account to the firm for that amount, notwithstanding the price it might bring at the sale; deny that the exchange of lands between defendants and Clifton was in pursuance of the fraudulent contract previously charged, or that it was unfair or unequal, but that the lands they procured from him were worth what they gave him for them; had Clifton's claim to 366 dismissed as soon as they could do so after the exchange with Clifton, and admit the purchase of it at Sheriff's sale at the price charged; deny any arrangement at this or any other sale, to prevent competition; the lands in Early County brought $451,$\frac{43}{100}$, and were not purchased by them; that the lot in Lowndes was purchased by them at $200; they state that the consideration of the deed, from Casey to defendant, Lawton, was his release from the covenant of warranty to McGuire for one-half of lot 281; and deny that it was understood between Casey and Lawton that Lawton should take his place and pay the mortgage; and deny the motive imputed to them for foreclosing the mortgage, or that they ever used it to prevent competition, and only become bidders for and purchasers of the land to save themselves, after having offered complainants and others an opportunity to unite with them, and contribute, rateably, to the value of the land they held, to the discharge

of the incumbrance, which they refused ; they admit that the lot claimed by Bailey has been recovered from, and is subject to the mortgage, and express their willingness to sell the same before going on the other lands.

Upon the coming in of this answer, defendants moved to dissolve the injunction, upon the ground that it denied the equity of complainant's bill ; and the Court passed an order dissolving the injunction, which is assigned as error here.

R. F. LYON and SLAUGHTER, for plaintiffs in error.

H. M. BUFORD ; MILLER AND HALL, for defendants in error.

*By the Court.*—BENNING, J. delivering the opinion.

The first question in this case is, whether the equity of redemption, in any of the lots of land, became merged in the legal estate ?

It is alleged in the bill, that with respect to a number of the lots, these two estates met in Lawton and Cheever; and this allegation, it is insisted by the Counsel for the plaintiff, has not been fully denied by the answer. And they argue, that when the equity of redemption and the legal estate meet in the same person or persons, the law makes the former estate merge in the latter.

Whether this allegation has been denied by the answer or not, we do not find it necessary to inquire. Let us admit that it has not been.

Considering, then, the fact to be, that the two estates did, in some of the lots, meet in Lawton and Cheever, the question is, did the equity of redemption become, in such lots, merged in the legal estate ?

Whether a merger shall take place or not, depends, as a general rule, upon this : whether the person in whom the two estates meet *intends* that it shall take place. In *Forbes vs. Moffatt*, the Master of the Rolls says: " It is very clear, that a person becoming entitled to an estate, subject to a charge

for his own benefit, may, if he chooses, at once take the estate and keep up the charge. Upon this subject a Court of Equity is not guided by the rules of Law. It will sometimes hold a charge extinguished, where it would subsist at Law; and sometimes preserve it, where, at Law, it would be merged. The question is, upon the intention, actual or presumed, of the person in whom the interests are united. In most instances, it is, in reference to the party himself, of no sort of use to have a charge on his own estate; and where that is the case, it will be held to sink, unless something shall have been done by him to keep it on foot."

" The first question, therefore, is, whether John Moffatt has done any thing to determine that election—which he undoubtedly had—if not, the question will be, upon the presumption of Law, under the circumstances of the case." (18 *Ves.* 390.)

This statement of the Master of the Rolls is supported by several cases which he cites, and also by some cases which have been decided since the decision in the case in which the statement was made, as these: (*Wigsell vs. Wigsell,* 2 *Sim. & S. Ld. Clarendon vs. Barham,* 1 *Y. & Coll. C. C.* 688, (as stated in *Chitty's Eq. Dig.* 788, 14.) *Reddington vs. Reddington,* 1 *Ball & B.* 131, (as stated in same.) *Pitt vs. Pitt,* 1 *Turn. & R.* 184.)

And with this statement accords a decision of this Court— the decision in *Jackson vs Tift,* (15 *Ga. R.* 557.) In that case, Jackson, the mortgagee, became the purchaser of the equity of redemption in the two halves of the mortgaged lot of land. The facts were such as to require the presumption, that he intended the equity of redemption, in one of the halves, to merge; but the equity of redemption, in the other, not to merge. The decision was, that as to the first mentioned half, there was a merger; as to the other half, none.

[1.] We think it therefore safe to say, that as a general rule, merger does not take place, if the person in whom the two estates meet *intends* that it shall not take place.

That being so, the question becomes this: did Lawton and

·Cheever intend, in this case, that their equity of redemption should merge in their legal estate?

[2.] [3.] And the answer to that question must be, no; for they took from the mortgagee, Thomas, not a conveyance to the land, but an assignment of the mortgage; they stepped into the place of Thomas in the foreclosure suit; they prosecuted that suit to judgment and execution; they tried to sell under the mortgage *fi. fa. all* of the mortgaged lands; and they did sell a part of those lands—the very part in respect to which the bill insists, that there was a merger, viz : that part in which they, themselves, had the equity of redemption. Now the whole of this course of conduct, on their part, was inconsistent with an intention that there should be a merger. It follows, that there was no such intention.

And if there was no such intention, there was no merger; for as we have seen, there is no merger where the intention is, that there shall be none.

Was the judgment of foreclosure binding on the plaintiffs, as they were not parties to it?

The only party defendant to the judgment, was Casey the mortgagor. But the plaintiffs were the purchasers from Casey, of parts of the property contained in the mortgage; and they assert no right, except such as they derived from him by that purchase. And they could, by that purchase, derive from him no right as against the mortgage, which he, Casey, did not himself possess. And he did not, himself, possess the right to put the mortgaged property in a situation which would render it necessary for the mortgagee, in framing his suit of foreclosure, under the Judiciary Act of 1799, to make, as a party defendant to the suit, any other person than the mortgagor himself. That Act says : " The method of fore-·closing mortgages on real estate, in this State, shall be as follows: Any person applying and entitled to foreclose such mortgage," "shall petition the Superior Court," "stating the ·case and the amount of his, her or their demand, and describing such mortgaged property; and the Court shall grant a rule, that the principle, interest and cost shall be paid into

Court," "which rule shall be published" "or served on the mortgagor, or his special agent," &c. It is only the "*mortgagor* or *his* special agent," that the rule is to be served on. The mortgagor, therefore, has no right so to treat the mortgaged property as to make it necessary for the mortgagee, in order to get a foreclosure, to serve his rule upon any person except him, the mortgagor. But this right the mortgagor would have, if he could, by selling the mortgaged property, give to the vendee the right to be a party to a rule for foreclosure. The right to be a party to that rule, the mortgagor, therefore, cannot give to his vendee.

[4.] It follows, that the vendee is bound by the judgment of foreclosure, although not a party to it. He is, however, in privity with the vendor, who is a party to it.

And this is no more than what is true in analogous cases. A *general* judgment binds the property of the defendant to it, in whose soever hands the property may be found, if it got into those hands at any time after the lien of the judgment had fastened itself upon it, notwithstanding that the person into whose hands it may have so got had never, in fact, heard of the judgment.

When the mortgagor sells parts of the mortgaged property at different times, to different persons, can these persons compel the mortgagee to go, for his money, first, to the property remaining unsold in the hands of the mortgagor; and if that should prove insufficient, then to the parts of the sold property, in any particular order of precedence?

The mortgagee, by the terms of his mortgage, has the *legal* title, equally, to every part of the mortgaged property; i. e. he has, if the mortgagor, himself, had that title to mortgage; and this legal title the mortgagee cannot be deprived of by any thing except some act of his own. Therefore, he cannot be deprived of it by any act of the mortgagor's—as, a sale of the property by the mortgagor. And hence, if there be a failure to pay the mortgage debt, and therefore, a forfeiture of the mortgage, every part, equally, of the mortgaged property, even though some of it may have been sold by the

mortgagor, becomes, at Law, to him and his vendee, of such part, *dead.* And being thus dead to them, at Law, on what terms is it to be made alive in Equity ? Only on the terms of the payment of the mortgage debt. Further than this, equity, itself, will not interfere with the legal rights of the mortgagee. (*See* 2 *Black. Com.* 158. *Code on Mortgage,* 513, 517.)

This is the doctrine of the old law. And what change, in the old law, has been made by the new—by our Statute? In respect to the right of redemption, none. Before the mortgagor can, by the new law, redeem his land, he has to pay the mortgage debt; and that was the very thing which he had to do by the old law, before he could redeem his land. The change made by the new law, is merely as follows :

By the old law, the effect of foreclosure, was to vest the mortgaged property absolutely in the mortgagee; by the new, the effect of foreclosure is to vest in the mortgagee the right to sell that property and to take as much of the proceeds of its sale as shall be sufficient to pay him his debt and costs. This change does not at all enlarge the terms on which the mortgagor may redeem. Notwithstanding this change, he must still, before he can redeem, pay the debt. Previous payment of this, the new law requires explicitly and peremptorily. Its language is : "and the Court shall grant a rule, that the principal, interest and cost shall be paid into Court within twelve months thereafter;" (now *by the next* term;) "and unless the principal, interest and costs be so paid, the Court shall give judgment for the amount which may be due on such mortgage, and order the property mortgaged to be sold in such manner as is prescribed in cases of execution, and the money shall be paid to the mortgagee or his Attorney : but where there shall be any surplus, the same shall be paid over to the mortgagor or his agent." Unless the principal, interest and costs *be so paid,* the Court *shall* give judgment for the amount due on the mortgage, *and* order the *mortgaged* property to be sold in such manner as *is* prescribed in cases of execution.

The Statute then gives to the mortgagee the right to sell, under his judgment of foreclosure, any part of the mortgaged property, at his own election. A Court cannot interfere with a right thus given; certainly not further than to compel the mortgagee to take his money, if it should be tendered to him, and then to desist from any proceeding to sell the property.

[5.] This being so, a Court of Equity could not, at the instance of purchasers from the mortgagor of the mortgaged property, compel the mortgagee to resort, first, to the property remaining in the hands of the mortgagor; and then, according to some order of priority, to that in the hands of those purchasers.

And this, in part, is what a Court of Equity is, in this case, asked to do. The equity of redemption not having become merged in the legal estate, the defendants, Lawton and Cheever, as transferees of the mortgage, stand in the shoes of Thomas, the mortgagee. They, therefore, are to be considered as mortgagees. Considered as mortgagees, they are entitled to have payment of their debt before they can be required to abstain from selling, at their own election, any of the lands mortgaged to them. On the other hand, the plaintiffs are the purchasers of parts of the mortgaged lands from Casey, the mortgagor.

They, therefore, stand in the shoes of Casey, and so are to be considered as mortgagors. Considered as mortgagors, the only right which they have, as against the mortgagees, is the right to redeem their land on payment of the mortgage debt.

Such a right as that, does not give them a title to ask a Court of Equity to compel Lawton and Cheever, considered as mortgagees, to bring the parts of the mortgaged property to sale in any particular order.

After Lawton and Cheever shall have been paid the amount due on the mortgage, then those who pay that amount may raise the question, who, if any, are to contribute to their re-imbursement; and in what order and proportion they are so to

contribute.    On this question, nothing is now intended to be said.

I will, however, suggest for inquiry on this question, whether, when (e. g.) a mortgagor sells a part of the mortgaged property, the remaining part is the part which, as between vendor and vendee, is to be first applied to the payment of the mortgage, does not depend on the *intention* of vendor and vendee.    Suppose A, having property worth $10.-000, with a mortgage on it for $5.000, sells half of it to B for $2.500; the intention of both A and B, being that the other $2.500, which this half is worth, shall be paid by B, the purchaser, to the mortgagee, in satisfaction of half of the mortgage.    In such a case, if B should pay that $2.500 to the mortgagee, ought B to be allowed to call on A to pay an equal amount to him?    And in such a case, would not the fact, that the half of the land sold, was sold for but half its unincumbered value; i. e. was sold for all its value, less its share of the incumbrance on it, be *evidence* of an intention, in both vendor and vendee, that that half of the land was to pay its half of the mortgage?    I think, in practice, it is true, in general, that when a mortgagor sells a part of the mortgaged property, he requires and obtains for it a full price— a price equal to what would be the value of the part, if it were free from incumbrance.    And if, in such a case, the vendee, on losing his part by the operation of the mortgage, is entitled to contribution from the vendor, is it not because there was an intention, in both vendor and vendee, that the vendee should have contribution, an intention of which the payment of this full price is the *evidence?*

The bill states that Lawton entered into a fraudulent contract with Clifton, the holder of one of the lots included in the mortgage, to prevent him from " running the land;" a contract by which Lawton agreed to protect Clifton's title to that lot, against the mortgage, or to compensate him for the loss of the lot, in case it should be sold by the mortgage; and that Clifton, who had commenced to bid for lot No. 281, in consequence of this agreement, desisted from bidding, and

let the lot be knocked off to Lawton at $300, when it was worth $2.500; and when he would, himself, have given $2.-000 for it but for the agreement; and that, by the agreement, Clifton was also made to abstain from bidding for another lot.

Now, it seems that the sale at which this agreement (as it is stated in the bill to have been) took place, was a regular, public sale, after due advertisement, under the judgment of foreclosure; a judgment to which the complainants, if not parties, were privies. It is to be presumed, therefore, that they were present at the sale, and might, if they had seen fit, have made every piece of land fetch its full value. And it does not appear but that, at the time of sale, they knew or suspected, what was going on, as they say, between Lawton and Clifton.

Suppose, therefore, the allegations in the bill be taken to be true; to what relief do they entitle the complainants? The most that a Court of Equity, in such a case, would do, would be to annul the purchase of the two lots by Lawton or Lawton and Cheever, and order another sale of them—a sale just like that was, at which the annulled purchase had been made. A court of Equity *could not* make Clifton compete for the lots ; or, indeed, make Lawton and Clifton cease from *acting on* their old agreement. So that, at the new sale, if one were ordered, the complainants would not, in a single respect, be any better off than they were at the old.

The equity, then, that is in this statement of the bill ,is not very strong. But if it were stronger, it could not be of any avail to the complainants, for the answer denies the truth of the statement.

For aught that appears then, taking both bill and answer together, the lands which were sold by the Sheriff, under the judgment of foreclosure, were fairly sold. If so, the prices they sold for, are the sums to be credited on the mortgage debt.

And this disposes of all the questions in the case that

ought to be disposed of, considering what is the present state of the case.

The result of all that has been said is, that the dissolution of the injunction by the Court below was right.