Deshon *v.* Porter.

---

## DESHON *versus* PORTER.

The grant of a water privilege cannot be modified by any of the rules of construction, where the intention of the parties is clearly expressed by the language of the deed.

A grant of a water privilege for a *specific purpose*, will restrict the grantee, or those claiming under him, to its *use* for that *purpose* alone.

A provision in *such deed*, that the grantee shall keep in repair a *specified part* of the dam from which the water is to be taken, furnishes no evidence, that it is a grant of a *similar proportion* of the water, as such a construction would be repugnant to the language used in the grant.

ON FACTS AGREED.

CASE, for diverting the water from plaintiff's flume, &c.

The Court were authorized to draw inferences as a jury might, and enter judgment according to the legal rights of the parties.

One Mark Blaisdell formerly owned the entire premises, and had a grist-mill thereon. In 1831, he conveyed to one Henry D. Smith a parcel of land near to the grist-mill, about one-half acre, " likewise a water privilege for tanning purposes in all its various branches, which privilege is

to come out of the grist-mill dam, (one twelfth part of said dam to be kept in repair by said Smith.")

The plaintiff has the rights which were conveyed to Smith.

The acts done by defendant were by authority of the owners of all that part of the land and privilege owned by Mark Blaisdell, which were not conveyed to Smith. The deed to them was made in Feb. 1842, but not recorded till 1853, and after the commencement of this suit.

The plaintiff had a flume connected with the grist-mill dam, but he did not use the water privilege for tanning purposes, he had two circular and an up and down saw and planing machine, and used the water for such machinery.

Smith when he purchased erected a tan-yard and carried on that business there till 1845. Whether it took more or less water to drive the plaintiff's machinery, than Smith used, could not be ascertained.

The defendant, by direction of the owners aforesaid, planked up the head of plaintiff's flume, and prevented him from using the water for his machinery.

*Dickerson,* for the defendant.

1. The intention of the parties is to be learned from the deed, and the *use* of the water is therein restricted to a specific purpose. No consideration of public policy can change the agreement of the parties. *Mayor* v. *Commissioners of Spring Garden,* 7 Bur. 348; *Schuylkill Nav. Co.* v. *Moore,* 2 Whart. 477; *Dewey* v. *Bellows,* 9 N. H., 282; *Ashley* v. *Pease,* 18 Pick. 273; *Tyler* v. *Hammond,* 11 Pick. 193; *Cutler* v. *Tafts,* 3 Pick. 272; *Sprague* v. *Snow,* 4 Pick. 54; *Field* v. *Houston,* 21 Maine, 69.

2. The quantity of water necessary to carry on "tanning purposes in all its various branches," is uncertain; and as the deed obviously authorizes the grantee to use such quanty, whatever it may be, he could not be limited to the use of one twelfth of the water.

3. The situation of the parties at the time of the conveyance shows that the grant limits the use of the water to a particular purpose.

*Palmer*, for plaintiff.

The plaintiff denies the right of the defendant to question his use of the water, as the deed under which the right of interference is set up, was not recorded till after our suit was commenced, and in the deed itself nothing is covered or conveyed, which is claimed by the plaintiff. But assuming that they have a right to stop all the water not conveyed by Mark Blaisdell's deed to Smith, what was that grant?

The language of that deed was but a measure of the proportion of water granted. It is apparent that the term privilege is used in no other sense except as a water power. The construction is to be settled upon the deed itself, if it can be. The circumstances attending the transaction, the situation of the parties, are legitimate means of assistance. 3 Man. 352; 15 Pick. 23; 19 Pick. 445; 2 Pick. 366.

The policy of the law does not favor the tying up by *construction* so valuable an agency as water to a specific use. *Bullen* v. *Runnells*, 2 N. H. 262.

The appropriation to a particular use must be by express terms, and an express prohibition against any change, for such particular use is against common right, policy and progress of improvement. 1 Bar. & Ald. 238; 15 Johns. 218; 15 Man. 313; 6 N. H., 22; 9 N. H. 458; 2 Whart. 477; 12 Conn. 317.

TENNEY, J. — It is admitted, that the defendant planked up the flume, as alleged in the plaintiff's writ, and thereby the water was diverted from the plaintiff's machine shop; and that this was done under the authority of Henry Matthews and others, who owned the grist-mill and privilege at the dam, subject to the plaintiff's rights under a deed from William R. French to him, dated August 21, 1851, which in addition to a parcel of land connected with a mill-site, described therein, grants, "likewise a water privilege for tanning purposes, in all its various branches, which privilege is to come out of the grist-mill dam, (one twelfth part of said dam to be kept in repair by said Deshon.")

It appears from the deeds introduced, that on January 12, 1831, Mark Blaisdell conveyed to Henry D. Smith, certain land, situated near a mill privilege, and the right to use water, described in the same terms used in the deed of French to the plaintiff. In this deed of Mark Blaisdell, Martha Blaisdell, his wife, relinquished her right of dower in the premises described. On November 6, 1834, Henry D. Smith conveyed in mortgage to William French, 2d, the father of the plaintiff's grantor, with a parcel of land, a part of that described in the deed of Mark Blaisdell, *the right to use the water, in the terms employed in the deed to him.* It appears from the evidence that this mortgage was foreclosed. There is no deed in the case from William French, 2d, to the plaintiff's grantor, or other documentary evidence of a transmission of title, but under the admission of the defendant, William R. French must have acquired his father's right to the water, by inheritance or some other mode. Henry Matthews, Chesley Matthews, and Joseph Matthews claim under a deed dated February 22, 1842, recorded August 27, 1853, from Martha Blaisdell, who represents herself as having title under the will of Mark Blaisdell, her late husband, and the right conveyed to her by Mary Smith, and the heirs of Mark Blaisdell. This deed describes several parcels of land, and then is saved and excepted from one of them, " so much of the same as was conveyed to Henry D. Smith, by Mark Blaisdell, deceased, by deed dated January 12, 1831." It is objected by the plaintiff, that the deed of Martha Blaisdell, to Matthews and others, was not recorded till after the institution of this suit. It is not perceived that this can affect the question in controversy, as it is not contended that the plaintiff has any interest in land conveyed by this deed.

From these deeds, and the admissions in the case, no doubt can be entertained that Mark Blaisdell was the source of title of both parties; and that the right which is in dispute of the plaintiff, " to a water privilege, for tanning pur-

poses, in all its various branches," &c., is under the deed of Mark Blaisdell to Henry D. Smith.

In giving a construction to the part of the deed touching the water privilege, it is proper, in the language of Judge SEWALL, in *Sumner* v. *Williams*, 8 Mass. 162, "that the situation of the parties, the subject matter of their transactions, and the whole language of their instrument, should have operation in settling the legal effect of their contract."

At the time of the deed from Mark Blaisdell to Henry D. Smith, the grantor was in possession of the land, and the mill privilege ; and thereon in operation was a grist-mill, with two run of stones. Smith was a tanner, and wished to obtain a privilege on the same stream on which to erect a tannery, and carry on his business with the aid of water power, so far as was necessary or desirable. And it would seem, that it was supposed, that he would need so much of the water, and at such seasons of the year, as to make it proper that he should be at the expense of keeping the dam in repair, in the proportion that his expected use therein would bear to the whole use. After the purchase, he put in operation his works connected with the tannery, and continued them till he disposed of his interest.

The principal question is, what intention of the parties is to be derived from the language of the deed, taken in connection with the situation of their business, and what may be supposed to be their respective objects and wants ?

Certain general rules of construction in relation to the grant of water power, make a part of the law, when not controlled by the plain and unambiguous meaning of the language employed in the grant. One rule is, that the grant of a mill-site, where mills are standing, or where the terms of the grant indicate, that it is the intention of the grantee to construct such, the latter may appropriate the privilege to any purpose at pleasure, with the right to change the purpose, whenever he may choose. And where the language is not so clear as to free the case from doubt, whether, the intention was to give a measure of the quantity to be used, or to con-

fine the use to a specific object, the former is more favored, because all grants should be construed most against the grantor in such cases, and most for the general interest of the public, in order to give encouragement to the improvements which may be anticipated in an enterprising and growing community. But these rules have no influence in a question of the construction of a deed, where the intention of the parties is clearly expressed in the written agreement made by themselves.

In the deed from Mark Blaisdell to Henry D. Smith, the object of the grant of the water power is as direct and simple as language could make it, without the use of restrictive words. There is nothing tending to show, that any other purpose was then entertained, or would be thought of afterwards. The deed contains no words indicative of an intention to give a general measure of the quantity of water power granted, such as " so much as would be required," &c. " the quantity necessary," or " sufficient," for the purposes of tanning.

The grantor was the owner of the grist-mill, then in operation. He would have no interest to favor the erection of another mill of the same kind, but to prevent it; and consequently may be supposed to desire to restrict the grant, so as to secure him from the exposure to the loss of patronage. A tannery, in all its various branches, so far from diminishing the business of the grist-mill, would tend to increase it, by bringing to its vicinity, those who might avail themselves of its advantages. The grantee was a tanner, and desirous of obtaining a situation, where he could carry on the business of his trade with success in all its various branches. And the construction of his works and the subsequent occupation, while he owned it, manifested no other purpose than that expressed in the deed.

By adopting the construction contended for by the plaintiff, serious difficulties might arise in questions relating to the quantity, secured to the grantee, if he were to substitute other works for those connected with such as were needed

for the purposes of tanning. The language furnishes no measure whatever for any other object than that of tanning. The grantee was not in the least restricted in his use of water for that purpose, but could enlarge his operations *ad libitum.* The grantor was willing to give full power for the extension of the tanyard, and for the increase of the machinery, to be wrought by water in the tanning business in all its variety, believing from the nature of the subject matter, that it could not be carried so far as to be injurious, beyond the consideration received. On the other hand, if the tannery could be abandoned for other works, the deed is silent as to what works can be substituted, and those holding under the grant would be at liberty to erect a gristmill, a saw-mill, or a factory, which might require for successful business a large proportion of the water, which would run in the stream. And when the owner of the dam and the grist-mill should find it worthless, by the withdrawing of the necessary quantity of water to work it, and in a suit against the owners of the mills or factories, erected under the grant, it is not easy to perceive what rule of quantity, the Court could give to the jury, for the water, which the defendant could take; nor could the jury as matter of fact, know from any experience of their own, what rule to apply. There could be no evidence which could enlighten them, when it is considered, that at the time the grant was made, no tannery had been erected at that place, and as there was no limit to the extent of the tannery to be put in operation, or to the variety of its different branches, the terms, " a water privilege for tanning purposes in all its various branches" as a measure of the amount of water, for any other purpose than that expressed, utterly fails. 18 Pick. 272.

The provision in the grant, that the plaintiff was to keep in repair one twelfth part of the dam, cannot restrict the grantee to the use of that proportion of the water. Such would be repugnant to the plain language used; and this cannot aid the plaintiff's construction.

The grantee of Mark Blaisdell and his assigns had a right to take the water from the grist-mill dam for a specific purpose. The fee in the dam was in Blaisdell, and it passed from Martha Blaisdell, his devisee, to Henry Matthews and others. The right obtained under Mark Blaisdell's deed was an easement in the dam and the water, to be enjoyed according to its meaning indicated by the deed.

The plaintiff took the water from the dam, and was using it for a purpose not authorized by the grant; and the defendant, acting under the direction of the owners of the dam, violated no rights of the plaintiff in closing it and diverting the water.

According to the agreement of the parties, the plaintiff must become                                    *Nonsuit.*

SHEPLEY, C. J., and HOWARD, APPLETON and HATHAWAY, J. J., concurred.