THE CITY COUNCIL OF AUGUSTA *v.* LOMBARD.

1. Where a broad scheme of manufacturing by the use of water power embraces the duty on the part of the owner of the water to furnish an adequate and continuous supply to numerous separate and distinct manufacturing establishments, and to keep the canal, its races and the openings of such races in proper condition for that purpose with reference to the ordinary stages of the water, anything in the way of removing obstructions to the free flow of the water, which is necessary or proper to be done in order to perform these duties, may be rightly done, although the doing of it will render the canal and one or more of its races more subject to overflow in times of high and extraordinary freshets, and one or more of the manufacturing establishments may thereby be exposed to serious damage on these extraordinary occasions.

2. No diligence on the part of the water owner to anticipate and provide against extraordinary floods is due to its patrons, except such as is consistent with a right performance of the main, constant and regular duties above referred to. If, in the present case, the removal of the structure at the head of the race was necessary or reasonably proper as a means of furnishing at ordinary stages of the water a continuous and adequate supply to the establishments located along the race, the removal of the structure was not wrongful as against the plaintiff and he could not recover. But if the removal was not necessary or reasonably proper for this purpose, and if the defendant in the exercise of ordinary diligence could and should have foreseen that it would expose the plaintiff's establishment to damage by any freshet not higher than some which were known to have previously occurred in the history of the same general manufacturing enterprise, then the removal would be wrongful, and the plaintiff, if injured thereby, might recover.

3. The court erred in charging the jury thus: "If, however, the gates were not originally put there for the purpose claimed in plaintiff's suit, but were afterwards used by the city for that purpose and so known to the plaintiff, and defendant knew plaintiff relied upon the gates for the protection of his property and they were really necessary to protect his property, and the removal of the same was the direct or proximate cause of the damages claimed, then the city would be liable for such damages as have been shown to flow from said causes."

4. All evidence as to freshets subsequent to that by which the damage complained of in the declaration was done, was irrelevant and inadmissible.

5. The mere opinion of a witness that the damage would not have been done if the conditions had remained unchanged, is not

admissible; but his opinion, together with the facts on which it was founded, would be admissible. The same rule holds as to the opinion of a witness that the current by which the damage was done, came down the race and not from another direction.

6. That the plaintiff, if he had known the act complained of would thereafter be done by the defendant, would not have engaged in business where he did and where the damage was sustained, was irrelevant, as there was no stipulation between the parties touching the matter, and nothing was said on the subject before the plaintiff did engage in business at that place.

7. The court erred in not granting a new trial.    *Judgment reversed.*
November 27, 1893.

Action for damages.   Before Judge RONEY.   Richmond superior court.   January 31, 1893.

Lombard sued the City Council of Augusta for damages resulting from the removal by the defendant of water-gates which had been put in the second level of the Augusta canal at the entrance of the head-race which conveyed the water to the plaintiff's foundry. A verdict in the plaintiff's favor was rendered, and the defendant excepted to the overruling of its motion for a new trial. The declaration alleges, that on July 31, 1887, and for a long time before, the plaintiff was and still is the lessee of property in Augusta on the east side of Kollock street, and immediately on the south side of the third level of the Augusta canal, on which property he was carrying on a foundry business, the machinery of which foundry was run by water received from a head-race from the second level of the canal, for which water he pays the defendant a large rental; that at the time of the building or cutting of the head-race, strong and substantial water-gates with solid brick abutments were constructed at the point where the head-race leaves the second level of the canal, and the main object in constructing the water-gates was to regulate and control the volume of water passing through the head-race during periods of very high water in the Savannah river, and consequent high water in the second level of

the canal; that early in the spring of 1887, the defendant had the water-gates taken out, notwithstanding plaintiff's objections, who earnestly protested at the time, and notified the defendant's officers and agents superintending the removal of the gates, that the effect thereof would be to seriously damage him at times of high water; that in consequence of said removal, on Sunday, July 31, 1887, when the Savannah river reached its highest stage, large and unusual quantities of water flowed from the head-race in such volume as to run over the banks or dams of the head-race, which dams of the head-race were lower by one or two feet than the dam of the second level of the canal, by which sixty feet or more of the bank or dam next to his foundry yard and buildings was washed away and large quantities of water precipitated upon his premises; that the loss thereby resulting to him was caused by the negligent, reckless and unnecessary removal of the water-gates, which had been constructed for the purpose of guarding against the very character of injuries herein complained of, and but for their removal the damage would not have been done him; and that the defendant is the owner and has sole control, supervision and management of the canal and its branches.

In addition to the plea of not guilty, the defendant set up the following: The gates were not constructed to regulate and control the volume of water passing through the head-race during periods of very high water in the Savannah river and consequent high water in the second level of the canal, but as head-gates of the race-way for the Excelsior Mills, and the sole object of the construction of the gates was to cut off the water from the race-way for the repair of the same, or for such work as might be necessary in connection with said mills. They were never constructed, fitted for, nor used for flood-gates to control or regulate the volume of

water in the second level of the canal during high water in the river. The alleged damages set out by the plaintiff were the result of the act of God, a freshet of extraordinary rise in the Savannah river, against which human foresight, by the exercise of all reasonable care and diligence, could not have provided, and defendant exercised all ordinary care and diligence. At the date of the lease of the premises by plaintiff, the gates were at the opening of the race-way from the second level of the canal; he had legal notice of defendant's right to increase the supply of water to Berry's mill under its obligation to him; and the removal of the gates was a needful and proper alteration, and was consistent with sound principles as applied to the nature of the enterprise and the business relations and circumstances of defendant with the different mills. The proximate cause of the damage to plaintiff was not the removal of the gates, but an extraordinary rainfall or freshet in the river, against which defendant could not provide by the exercise of ordinary care and caution. The gates were not, at the time of the building of the head-race, constructed at the point where the head-race leaves the second level of the canal. The canal was begun in 1845, and was completed through the city and first used in 1847; the second level in which the head-gates were built was not constructed until 1847. From the date of the construction of the canal up to the date of the alleged damage in 1887, there had been but three floods in the river: one occurred in 1852 before any part of the race-way was dug, and the other two occurred in 1864 and 1865, many years after the head-gates were put into the second level; therefore the head-gates could not have been put therein to control and regulate the flow of water in the race-way used by plaintiff, which had no existence at the time they were put in, nor to protect against any flow whatever. They could not

have been used as a protection against a flood, because it is impossible for human foresight to guard against or anticipate the varying heights to which the waters of the river rise during a flood; gates which might protect against a flood of thirty-four feet, four and one half inches, as in 1864, would not protect against one of thirty-four feet and one inch at the bridge, as in 1887.

The motion for a new trial contains thirty-four grounds, the only ones necessary to be stated here being that the verdict is contrary to law and evidence; that the court erred in charging as stated in the third head-note, and in overruling defendant's objections to testimony given by the plaintiff and by William Pendleton. These objections were, in brief, that the testimony was irrelevant, tended to confuse the issues before the jury and to put upon the defendant the burden of showing that it was not responsible for the damage resulting from the freshets of 1888 and 1891, and showed merely expressions of opinion on the part of the witnesses, and was in the nature of hearsay. The plaintiff testified, that since the overflow in question he had been injured by high water in 1888 and 1891; that the dam of his shop was washed away at these times; that in 1887 and in 1888 they refilled the banks, but since 1891 they have driven the piling, but the filling has not been done yet. Also, that if these gates had been there the water would not have got in his yard and done the damage it did. Also, that he did not think he should have leased the property if he had known the gates were going to be removed. Also, that in 1891 the defendant made an effort to dam the water and keep it out of Kollock street, by hauling plank and putting them on the west side and hauling sand-bags and throwing them in to stop the water; that this would not have been necessary if the gates had been in there as they were before; that in the freshet of 1888, he saw the water run over the banks of the canal, and

it washed him out the same as before; that he did not think it would have been done if the gates had been in there, but thought the water would have backed in from Broad street and would have been in there before it broke over the dam and backed up in there and would not produce the current; and that the water in the second level in 1888 was higher than in the third level, and in 1887 also. William Pendleton testified that he was acting as superintendent for the plaintiff at the foundry, and had been employed there ever since 1866. The portion of his testimony to which the defendant took similar objections to those already noted, is this: The city council attempted to dam this water up on Kollock street in 1891. I know as much about it as I did about the gates. I judged from the interest of everybody that they wanted to save that bank, and it was the opinion that the dam was put in to save the bank. No great damage was done to the plaintiff's shop in 1891, but the yard and foundry were washed out by the bank breaking. They broke in 1888, but I did not see them then. I was not there when the break occurred in 1887 that did the damage, and cannot tell if the water that did the damage came through the head-race of the canal, or was water that came from somewhere else. I was not there when the break occurred. I know that we have never feared any water that could come down Kollock street. I have stayed there until the water got to be a general freshet in the city and the water on Kollock street when it was the largest and the most dangerous at our banks. Being absolutely familiar with the premises, working there as I am, of course the current came through the race-way. I never saw the water coming down Kollock street from the shop; it goes through the other way.

    J. S. DAVIDSON and J. R. LAMAR, for plaintiff in error.
    TWIGGS & VERDERY, *contra.*