MUSCOGEE MANUFACTURING COMPANY *v.* EAGLE & PHENIX MILLS.

1. To constitute a covenant running with the land, the covenant must have relation to the interest or estate granted, and the act to be done must concern the interest created or conveyed. A covenant running with the land relates directly to the land and follows it into the hands of assignees; a personal covenant does not do so.

2. Where land abutting on a river and including its bed, in which river there was an undeveloped water-power, was divided by a city into water lots which were respectively numbered beginning with that lying furthest north, and the lots bearing even numbers were sold, and in the deed it was provided that the purchaser should build above or opposite lot No. 1 a dam with a canal or race of the character described, which canal or race should extend through the other lots; and where the deed also contained the covenant, "Said lots of even numbers and their improvements, and no other property whatsoever, to be forever liable for the payment of any damage which said city or any person or persons or company of persons, to whom they may sell or convey any one or more of said lots of odd numbers, may sustain by reason of the failure to complete said race or canal, or to keep the same and said dam in good repair:" *Held*, that the covenant quoted was one running with the land.

3. Grants by implication are not favored.

4. Where the legislature authorized the City of Columbus to lay off water lots on the Chattahoochee river, and to dispose of them by sale or lease "for such times and on such terms as they deemed for the interests of the city," and where subsequently, all the water lots having been acquired by certain persons, the legislature incorporated four persons and their associates and successors as the Water Lot Company, conferring upon them in the charter full power "to have, hold, purchase, receive, possess, enjoy, and retain to them and their successors, lands, rents, tenements, hereditaments, goods, chattels, and effects, of whatsoever kind, nature, or quality the same may be, and the same to sell, grant, demise, alien, or dispose of," and provided that the "death of one or more of the directors, or parties in interest, shall at no time, or in any case, prevent or hinder or delay a sale or sales of the said lots, or any of them, or an interest therein, by the survivors, in the name of the corporation:" *Held*, that there was no legislative restriction which prevented a merger of rights running in favor of some of the lots for the benefit of others, when all became the property of one person, although before the incorporation.

5. Nor did the action of the legislature so operate as to restrict the right of the owner of all the lots, or the corporation which it created, from making covenants or stipulations as to the rights which purchasers under them should have in regard to the amount of water or power to be used by them respectively; nor so as to require that each purchaser

from such common owner should be entitled to one nineteenth part of the water afforded by the river (nineteen of the lots being involved in the present controversy).

6. As a general rule, a covenant in a deed of land restricting the mode of its use, and inserted for the benefit of adjoining land of the grantor, will be extinguished by the subsequent vesting in one person of the title to both tracts of land.

7. If two estates in the same property united in the same person in the same capacity, and it is contended that no merger took place, the person making such contention, if entitled so to do, must allege and prove facts negativing the existence of such merger.

8. One who grants a thing is deemed also to grant that, within his ownership, without which the grant itself would be of no effect. But this rule applies only to such things as are incident to the grant and directly necessary to the enjoyment of the thing granted.

9. If the right to use power from a dam has been acquired and affixed to a particular mill or parcel of real estate, it will pass by a grant of the property, with appurtenances. But if the power was not an appurtenance of the property at the time of the grant, it will not pass as such, although the grantor had a right to make use of the power at that time.

10. A grant of property will carry with it actual existing appurtenances, but will not create any appurtenances.

11. The allegations of the present petition fail to show such an existing appurtenance or necessary incident at the time of the grant under which the plaintiff claims as to bring the case within the rule stated above. Moreover, it seeks to determine what a person claiming to be a remote grantee from the holder of the entire title acquired, not so much by grants which the latter made as by those which he received.

Argued February 27,—Decided August 13, 1906.

Rehearing Denied August 17, 1906.

Equitable petition. Before Judge Littlejohn. Muscogee superior court. July 22, 1905.

The Eagle & Phenix Mills filed its petition against the Muscogee Manufacturing Company, alleging substantially as follows: The State of Georgia, being the original owner of all the land in the Coweta Reserve in Muscogee county, in the year 1828 set aside 1200 acres for a town to be called Columbus, caused the tract to be divided into streets, lots, and commons, and offered lots for sale. The tract had for its western boundary the line indicated by high water-mark on the western bank of the Chattahoochee river, being the line that separates the States of Georgia and Alabama, so that the land set apart for the town embraced the entire river. (See Dawson's Compilation, 132, 470, 474.) At a point within the town for a length of four blocks there was a marked descent from

the natural flow of the river, which was known as Coweta Falls. The land on the east bank of the river, not being available for either residence or business lots, was not divided into separate lots. until by the act of 1840 (Acts 1840, p. 187) the legislature authorized the Mayor and Council of Columbus to define Bay street and to lay off water lots fronting on that street, to extend them across. the river, and to sell or lease them on such terms as might be deemed best for the interest of the city. In 1841 the city council passed a resolution stating the terms on which the water lots were to be sold. In December of that year the city granted to John H. Howard and Josephus Echols, their heirs, executors, administrators, and assigns, all the even-numbered lots beginning with No. 2 and ending with No. 36, each being seventy-two feet wide. The consideration recited in the deed was one thousand dollars and the performance on the part of the grantees "of the conditions hereinafter named, and for and in consideration of their bond made to said Mayor and Council of the City of Columbus, bearing date the thirteenth day of June in the year aforesaid, requiring under a penalty the performance of said condition." The deed contained the following: "The said John H. Howard and Josephus Echols shall erect a suitable and sufficient and well-constructed dam across the Chattahoochee river, terminating in the eastern bank thereof, at any point on or above lot No. 1, in the aforesaid plan, plat, and survey designated, and below the north common lots, so that when said river is at its usual height five feet head of water may be obtained on said lot No. 1, and an increase had [the resolution of council says "an increased head"] on each of the lots below it (for the purpose of propelling machinery), by an almost level canal or race; and to construct and form a safe and well-constructed canal or race, extending from said dam through all of said lots; said dam to be so high, and said canal or race to be so capacious, that when said river falls to the lowest height at which it usually stands in very dry weather, all the water of said river may, as it runs down, pass through said canal or race; and keep said dam and race forever in good repair. Said lots of even numbers and their improvements, and no other property whatsoever, to be forever liable for the payment of any damage which said city or any person or persons or company of persons, to whom they may sell and convey any one or more of said lots of odd numbers, may sustain by

reason of a failure to complete said race or canal, or to keep the same and said dam in good repair; and to commence in good faith and not evasively the erection of said dam and the construction of said race or canal within twelve months from the twenty-ninth day of June, in the year aforesaid; and to have said dam completed and said canal or race so far completed that said five feet head of water may be obtained on said lot number one, and available for propelling machinery, within twenty-seven months from the date hereof; and to fully complete said canal or race within five years from the date and year last aforesaid; and in the event of a failure to erect said dam and said race within the time limited, said lots of even numbers shall revert to said mayor and council." In 1843 the city conveyed to John H. Howard for the expressed consideration of $5,000 all the odd-numbered lots, including numbers one to thirty-seven. The deed contained the following clause: "To have and to hold the right and title and interest which the said party of the first part has in and to said bargained lots and premises, together with all and singular the rights, members, and appurtenances and privileges thereunto in anywise belonging to or appertaining, so far as the same are now vested in and belonging to the said party of the first part, to him the said John H. Howard, his heirs and assigns, forever in fee simple." And also the following: "It is hereby covenanted and agreed between the parties that the said John H. Howard, his heirs and assigns, shall improve one or more of said lots, by the erection of machinery, to be propelled by water, within four years from the date hereof, and that all the conditions, limitations, restrictions, and provisions of a deed made by the said party of the first part to John H. Howard and Josephus Echols, bearing date in December in the year eighteen hundred and forty-one, for the lots of even numbers in said plan and survey, shall be and are hereby made a part and parcel of the conveyance, and shall be binding upon the parties hereto, to all intents and purposes, as if the survey were herein specifically set forth." It provided for a basin at a point on some of the lots, and that the canal or race specified in the deed to Howard and Echols should terminate at this basin, and another canal or race should commence at that point and extend through the lots below it. Thus only the lots from one to nineteen are now involved. It was also provided that the lots conveyed by this deed should

revert to the city upon the same conditions as the lots of even numbers previously conveyed, and also if John H. Howard should refuse or fail to perform his contract as in this deed set out. To the change in the conditions Echols, one of the grantees of water lots of even numbers, assented in writing; and on April 21, 1845, Echols sold and conveyed all his interest in the water lots of even numbers to Howard, thus vesting the title to all the water lots in him. The Muscogee Manufacturing Company, through a number of mesne conveyances, is the successor in title of John H. Howard as to water lot No. 1. In accordance with the covenants and conditions under which he held title, John H. Howard constructed a wooden dam and canal so as to give five feet head of water to lot No. 1 when the river was at its usual height, and completed it in the year 1847, and then proceeded to erect a cotton mill on that lot. This dam becoming inefficient by lapse of time, the successors in title of Howard and Echols in the year 1857 constructed a new wooden dam extending across the river to a point about opposite lot No. 13, and also a new retaining wall extending from lot No. 1 south to lot No. 20. This dam was replaced substantially in the same location by a wooden dam constructed in 1868. Subsequently to this time the Eagle & Phenix Manufacturing Company was organized, and by purchase acquired title to all the water lots from No. 2 to No. 19, inclusive. In 1882, at its own expense, it constructed a stone dam immediately below the dam of 1868. In 1869 the defendant acquired title to lot No. 1, added to the buildings and improvements thereon and to the machinery employed, and operated such machinery by water power drawn from the river. Its predecessors in title first acquired the water-power under the original dam constructed in 1847, and subsequently under those built in 1857 and 1868. When the defendant went into the possession of lot No. 1 it operated its machinery with water-power furnished by the last-mentioned dam; and when it was replaced by the dam of 1882 the defendant used water furnished thereby. The Eagle & Phenix Manufacturing Company, being the owners of lots Nos. 2 to 19 inclusive, did not maintain the division of the water-power into eighteen parts, but the power to which each lot separately would be entitled if divided was concentrated in such manner that the best results could be obtained and distributed to other localities along the aggregate area of its

lots, so that the power to which it was entitled as the owner of eighteen lots was not confined by an arbitrary division to each lot. In accordance with this plan it built its factory and other buildings. Plaintiff is the successor of the Eagle & Phenix Manufacturing Company. When the flow of the river is normal or above normal opposite the water lots, ample power is afforded to operate plaintiff's machinery without regard to the amount of water-power used by the defendant on its lot No. 1; but when the flow of the river, on account of prevailing droughts or other causes, is lessened from its usual or normal amount, if the defendant takes from the canal or basin opposite lot No. 1 more water than it is entitled to have in the just proportion fixed by the original conveyance, the operation of the machinery of the plaintiff on its lots below No. 1 is seriously affected and great loss is occasioned to it. · Instances of this character are cited. The defendant claims the right to take from the canal or basin opposite its lot as much water as is necessary to operate the machinery of its mills located thereon. The plaintiff contends that the defendant is entitled only to use one nineteenth of the whole power generated by a five-foot head of water made by the entire flow of the river when at its usual height or normal condition, or less than one nineteenth; and that there should be a diminution of the head of water on lot No. 1 in proportion to the diminution of the flow of the river below its normal state, and an increase of the head of water on lot No. 1 in proportion to an increase of the flow of the river above its normal state. Plaintiff prayed for an injunction and damages. A demurrer to the petition was overruled, and the defendant excepted.

   *Slade & Swift, Hatcher & Carson,* and *J. H. Martin,* for plaintiff in error.

   *Goetchius & Chappell, Charlton E. Battle,* and *Spencer R. Atkinson,* contra.

   LUMPKIN, J. (After stating the foregoing facts.)

   The plaintiff's petition does not rest upon the general law of riparian rights, but upon contractual rights. It claims that there were certain covenants running with the land, embraced in the deeds from the Mayor and Council of Columbus to John H. Howard and Josephus Echols and to John H. Howard. In the deed to Howard and Echols executed in 1841, conveying the lots of even numbers, there was an agreement or covenant that the grantees

should erect a suitable and sufficient dam across the river at a point on or above lot No. 1, "so that when said river is at its usual height five feet head of water may be obtained on lot No. 1, and an increase had [in the resolutions of the municipal council the expression is, "and an increased head"] on each of the lots below it (for the purpose of propelling machinery) by an almost level canal or race; and to construct a firm and safe and well-constructed canal or race extending from said dam through all of said lots; said dam to be so high, and said canal or race to be so capacious, that when said river falls to the lowest height at which it usually stands in very dry weather, 'all the water of said river may, as it runs down, pass through said canal or race; and keep said dam or race forever in good repair." The deed also provided that the grantees should commence the erection of the dam and the construction of the race within twelve months, and have the dam completed and the canal or race so far completed that "a five-feet head of water" might be obtained on lot No. 1, available for propelling machinery, within 27 months from the date of the deed; and that the canal or race should be fully completed within five years; and there was a condition subsequent, that, in the event of a failure to construct the dam and race within the time limited, the lots so conveyed should revert to the mayor and council. The resolutions of the council also required that a bond should be given, conditioned for the completion of the dam and the construction of the canal or race to lot No. 1 within the time named. It is evident that, relatively to them, what they wished to have guaranteed was that a dam and race of a certain character should be constructed within a certain time. They did not require that manufactories should be built or improvements or machinery should be placed upon any of the lots; but they doubtless took it for granted that the building of a dam and race would be followed by the construction of some character of manufactory. They also retained the title to the odd-numbered lots, which it was most probably believed could be sold to persons who would wish to utilize them after the construction of the dam and race. It is alleged in the petition that they were constructed in accordance with the covenants, and it does not appear that the municipal authorities ever complained. So far, therefore, as that portion of the agreement directly affecting the mayor and council is concerned, we need not give it further consideration.

There was also this covenant: "Said lots of even numbers and their improvements, and no other property whatsoever, to be forever liable for the payment of any damage which said city or any person or persons or company of persons, to whom they may sell and convey any one or more of said lots of odd numbers, may sustain by reason of a failure to complete said race or canal, or to keep the same and said dam in good repair." This contained a covenant running with the land. *Howard Manufacturing Co.* v. *Water Lot Co.*, 53 *Ga.* 689; *Colquitt* v. *Howard*, 11 *Ga.* 568. As to the distinction between a personal covenant and one running with the land, see Spencer's case, 5 Coke, 16, 1 Smith's L. C. 174; *Willcox* v. *Kehoe*, 124 *Ga.* 484; *Atlanta, K. & N. Ry. Co.* v. *McKinney*, 124 *Ga.* 929; Tiedeman, Real Prop. § 190, p. 158; *Atlanta Consolidated R. Co.* v. *Jackson*, 108 *Ga.* 638. We are not prepared to hold, however, that the covenant relied on can be extended by implication to the limits claimed by the plaintiff. Grants by implication are not favored. Civil Code, § 3675(7); *McDonough* v. *Martin*, 88 *Ga.* 680, 681; 3 Farnham on Waters, § 774; Hoard *v.* Chesapeake & Ohio Ry., 123 U. S. 222; Trustees of Wabash & Erie Canal *v.* Brett, 25 Ind. 410; Hudson Canal Co. *v.* Pennsylvania Coal Co., 75 U. S. 276. The rule as to appurtenances and necessary incidents will be considered later.

Controversies growing out of these water lots have been several times before this court, and the plaintiff in error contends that the decisions are authority for the claims now asserted by it. But an examination of those decisions will show that they were not based on a construction of the original deeds to Howard and Echols and to Howard, but involved deeds made by subsequent holders of some of the water lots and the particular provisions in them. See *Colquitt* v. *Howard*, 11 *Ga.* 556; *Water Lot Co.* v. *Leonard*, 30 *Ga.* 577; *Howard Manufacturing Co.* v. *Water Lot Co.*, 53 *Ga.* 689; *Moses* v. *Eagle & Phenix Mfg. Co.*, 62 *Ga.* 455.

It is contended, that, under the general scheme evidenced by the acts of the legislature and the action of the municipal council, each water lot was impressed with rights as claimed in the petition. It will be observed, however, that the act of 1840 authorized the municipal authorities of Columbus to dispose of the water lots by sale or lease "for such times and on such terms as they may deem for the interest of said city." Thus the terms on which such dis-

position might be made were not fixed by the legislature, but left entirely to the mayor and council. The charter granted by the legislature will be mentioned later. The mayor and council first conveyed the lots bearing even numbers to Howard and Echols, and the deed included a covenant running with the land, as already stated. Subsequently they conveyed the lots bearing odd numbers to Howard. Later Echols conveyed all of his interest to Howard, and all of the lots became the property of the latter. Thus the title and the covenant running with the land both found their way into the hands of the same person. So that it may be said that some of his lots were encumbered with a covenant for the benefit of others of his lots. He stood practically in the situation of both covenantor and covenantee. If he violated the covenant in favor of some of his property, other parts of his property were liable for the breach. As the owner of the whole, in case of a breach of the covenant, he would have been both plaintiff and defendant in its enforcement. What was the result of such a condition? In Post *v.* Weil, 115 N. Y. App. 361, 5 L. R. A. 422, it is said: "A covenant in a deed of land restricting the mode of its use, and inserted for the benefit of adjoining land of the grantor, will be extinguished by the subsequent vesting in one person of the title to both tracts of land." Bouvier (Law Dict. word "merger," subtitle "of rights") says: "Rights are said to be merged when the same person who is bound to pay is also entitled to receive. This is more properly called a confusion of rights, or extinguishment." See also Rawle on Covenants (5th ed.), § 223; *Sibley* v. *Beard,* 5 *Ga.* 550; *Fields* v. *Willingham,* 49 *Ga.* 344; *Willis* v. *McGough,* 56 *Ga.* 198; Civil Code, § 3106; Goodel *v.* Bennett, 22 Wis. 565; Brown *v.* Metz, 33 Ill. 339, 85 Am. Dec. 277; Silverman *v.* Loomis, 104 Ill. 137; Waterbury *v.* Head, 12 N. Y. St. R. 361. Analogous to this principle is the rule that by the union of the dominant and servient estates in one person the easement is extinguished. On this subject in Washburn on Easements (4th ed.), 684 (*517), it is said: "As no one can be said to use one part of his own estate adversely to another part, the proposition is universally true, that if the owner of one of the estates, whether dominant or servient, becomes the owner of the other, the servitude which one owes to the other is merged in such ownership, and thereby extinguished." On page 685 (*518) it is said: "But where there is a union of an ab-

solute title to and possession of the dominant and servient estates in the same person, it operates to extinguish any such easement absolutely and forever, for the single reason that no man can have an easement in his own land." See also Hathorn *v.* Stinson, 10 Me. 224, 25 Am. Dec. 228; Hall *v.* Lawrence, 2 R. I. 218, 57 Am. Dec. 715; 2 Washburn on Real Property (4th ed.), 273.

It is contended that a merger does not take place where the person holding two estates intends that it shall not do so. The Civil Code declares as follows (§ 3106) : "If two estates in the same property unite in the same person in his individual capacity, the less estate is merged in the greater." (§ 3107) : "As a general rule a party can not hold a lien on his own property; but the owner of property, subject to a lien created or imposed against the property by another, may protect himself by purchasing the lien for levy on other property, or to hold it as a claim against the person liable to pay the same." In *Knowles* v. *Lawton,* 18 *Ga.* 476, it was held, that "If the holder of the equity of redemption takes an assignment of the mortgage which is in the process of foreclosure, and goes on with the suit of foreclosure, his intention, it is to be presumed, is that the equity of redemption shall not merge in the legal estate; and therefore the equity of redemption does not merge in the legal estate." This decision was rendered prior to the adoption of the code; but the principle that a merger of an equity of redemption into a legal estate may be prevented, and whether it occurs depends to a considerable extent on the intention of the person in whom the two estates meet, has been carried forward into decisions rendered since the code went into effect. See *Marshall* v. *Dixon,* 82 *Ga.* 436; *Ferris* v. *Van Ingen,* 110 *Ga.* 111 (where it was held that the intention that there should be no merger was a necessary deduction from the writings themselves); *Coleman & Burden Co.* v. *Rice,* 115 *Ga.* 510. But "If two estates in the same property unite in the same person in the same capacity, the lesser estate is merged in the greater, unless there is a manifest intention that such merger shall not take place." *Goodell* v. *Hall,* 112 *Ga.* 435; *Jackson* v. *Tift,* 15 *Ga.* 557; *Woodside* v. *Lippold,* 113 *Ga.* 877; *Clay* v. *Banks,* 71 *Ga.* 363; *Luquire* v. *Lee,* 121 *Ga.* 633. And where it is manifest that the person in whom the two estates meet intends that the merger shall take place, it can not be defeated by other parties. *Wilder* v. *Holland,* 102 *Ga.* 46. In its petition

the plaintiff shows that *it* practically deals with *its property* upon this basis, so far as there may rest upon some of its lots a covenant for the benefit of others; for it alleges that it is the owner of the entire power which would belong to each of the eighteen lots held by it, and it employs this power, not upon the respective lots, but concentrated at different points upon the entire property, as it deems best, thus claiming the right, as the owner of eighteen lots, to deal with them as it pleases in respect to the matter of water-power inter sese. If it may do so, why had not Howard the same right while all the lots belonged to him? We perceive nothing in the petition to show that he intended that there should not be a merger, or what the French law, borrowing from the Civil law, terms "a confusion." Under the original deed to Howard and Echols it was provided that the dam should be built terminating at any point on or above lot No. 1. It appears that the original dam was constructed at that point, but the later dams have all been built lower down the stream, that of 1857 being at a point opposite lot No. 13, and the present dam, which was erected by the prede-cessor of the plaintiff, being still somewhat further down. It appears, therefore, that the successors in title of Howard, including the plaintiff, have not felt themselves to be bound literally by the terms of the original deed, at least so far as the location of the dam is concerned. Howard, while owning all the lots, first built a cotton mill on lot No. 1. In conveying the other lots he certainly could have made a reservation as to the amount of water to be used by his own mill; and even if it should be conceded that there was an original covenant providing that lot No. 1 should only enjoy the use of one nineteenth part of the water-power, or less, there is nothing to indicate that he intended to keep this restriction open and prevent a merger, so as to limit the use of water by himself in his own mill as against persons buying lots from him further down the stream. What covenants or restrictions he actually made would appear from his deeds; but there is an entire silence in the petition on that subject. We do not mean to say that it was impossible to prevent a merger in Howard, or to carry forward the covenants in the deeds from the city. In a case involving a somewhat similar question (White *v.* Amsden, 67 Vt. 1, 30 Atl. 972), it was held, under the facts and the practical dealings between the parties, that there was no merger, or at least that certain by-

laws antedating the union of the estates were carried forward into subsequent conveyances. See also Simmons v. Cloonan, 81 N. Y. 557; Albee v. Huntley, 56 Vt. 454. But if the plaintiff relied on the claim that no merger or extinguishment took place when title to all the lots was united in Howard, it carried the burden of alleging facts which would negative such a merger. There is no allegation of any such fact, no statement of the provisions and covenants in deeds made by Howard, and none as to what plaintiff's own deeds contained. It does not even appear whether he first conveyed lot No. 1 or those of higher numbers. So far as the facts are alleged, they tend to support the theory of merger rather than to oppose it. As to the claim that there was a legislative intent to preserve the status of these lots respectively as originally laid out and sold by the city, the grant of authority to the city has already been mentioned. It may also be noted that on December 27, 1845, the legislature incorporated Howard and others, as owners of the water lots, under the name of the Water Lot Company of the City of Columbus, "in order to conduct their affairs and carry on their operations with greater facility." The incorporators were made able and capable in law "to have, hold, purchase, receive, possess, enjoy, and retain to them and their successors, lands, rents, tenements, hereditaments, goods, chattels, and effects, of whatsoever kind, nature, or quality the same may be, and the same to sell, grant, demise, alien, or dispose of;" and it was provided that the "death of one or more of the directors, or parties in interest, shall at no time, or in any case, prevent or hinder or delay a sale or sales of the said lots, or any of them, *or an interest therein,* by the survivors, in the name of the corporation." Acts 1845, p. 123. The italics are ours. This charter was amended on November 16, 1866, and among other things it was declared that 'the president and directors should "manage the entire business of the corporation, in such manner as they shall deem most expedient to develop the water-power owned by said company;" and that "all deeds or contracts made by or with the Water Lot Company as heretofore organized, shall be of like force and effect as though made under this amended charter." Acts 1866, p. 211. The putting of this property into the hands of a corporation with these broad powers indicates no legislative intention to place restrictions upon the use

of water by the owners of different lots otherwise than as might be agreed on between the company and purchasers.

The petition before us is drawn with much skill and ability; but a careful analysis will disclose that it rests on an erroneous basis. It sets out what were the conveyances prior to the union of the title to the entire property in Howard, and then assumes that he should or must have conveyed land on the same terms as to the right to use water. It merely alleges that he built a mill on lot No. 1, and that by mesne conveyances this lot passed to the defendant; and as to the other lots it alleges that subsequently to the construction of the dam in 1868 the Eagle & Phenix Manufacturing Company was organized, and "by purchase acquired title to all the water lots from 2 to number 19 inclusive, . . and being successors in title to John H. Howard and Josephus Echols, and being bound by the covenants and agreements set out in the original deeds of conveyance to Howard and Echols," it constructed a stone dam; and also that the plaintiff "is the immediate successor in title of the Eagle & Phenix Manufacturing Company, that it owns water lots from number 2 to number 19 inclusive." When Howard became the owner of the entire property, including the water-power, it is perfectly clear that he was not obliged to sell at all, either the whole or any part of it. He could have retained all the property and utilized it as he deemed best. The requirement in the deed to him was that he should improve one or more of the lots within four years by erecting machinery to be propelled by water. If he sold off some of the property, no reason is apparent why he could not have provided in his conveyance the extent of the right to use water which the purchaser should have; and if he did so, the purchaser would take subject to such restrictions. Suppose, for instance, he had thought that more than one nineteenth part of the water-power was necessary for the operation of his mill, why could he not have reserved what he considered necessary, or have limited the amount of water to be used by his grantee? And if he did so, can it be contended that the grantee would be entitled to more than the conveyance included? The real question to be determined is, not what Howard might have conveyed, or even what he should have conveyed, but what did he convey, and what did the plaintiff acquire under the conveyance or conveyances made by him or his successors? To attempt to hold that the plaintiff acquired certain rights,

including the right to use one nineteenth part of the water which the river or the pond resulting from the dam afforded, under the conveyances from Howard, without reference to those conveyances themselves, either alone or in connection with the previous conveyances and attendant circumstances, would be little more than a guess in the dark. In effect, what we are asked to do by this petition is to determine that the plaintiff, as holder under a chain of conveyances beginning with Howard, acquired certain rights and privileges, without any reference to what Howard in fact conveyed, but by reference to the deeds under which he acquired the entire property. In other words, to declare what rights Howard's remote grantees acquired, not by considering the grants from him, but solely the grants to him. As an illustration of the great difference in rights which may have arisen according to the provisions contained in the deeds intervening between Howard and the present plaintiff, two cases only need be cited. Thus in *Water Lot Co.* v. *Leonard,* 30 *Ga.* 560, 572, the covenant in the deed then under construction provided that the vendor would "so finish all the eyes in the canal or reservoir as to furnish and contain in said canal water in sufficient quantity to propel the machinery placed and erected on lot No. 11, by Leonard." It was held that the true interpretation of the deed was, that if the canal was completed and the eyes or gates at its mouth were so finished or constructed as to permit the water from the river to flow freely and without interruption into the canal, and the balance of the eyes so finished as to prevent the escape of the water from it except as it was intended that it should, and the race or wasteway was blasted out (except as to blasting out the race opposite to lots Nos. 11 and 12, which the grantee was to do), then the canal would furnish and contain sufficient water to propel the machinery; but "there was no covenant against great drought or unusual and excessive low stages of the water in the river." Again, in *Moses* v. *Eagle and Phenix Mfg. Co.,* 62 *Ga.* 455, an execution in favor of Leonard against the Water Lot Company was levied on certain of the water lots, and a claim was interposed by the Eagle and Phenix Manufacturing Company (which the present petition alleges was the immediate predecessor in title of the plaintiff). It was held that the deed under which the claimant asserted title did not convey an absolute estate in fee to the entire water lots therein referred to, but only up to a

certain line, with an easement to use the water beyond it, leaving the fee in the grantor to the remainder of the river-bed up to the Alabama line. These deeds are not set out in the record or before us in the present case, but the decisions are cited to show how different may be the rights of the present plaintiff according to the conveyances under which it holds, and that it is not sufficient to establish those rights to merely show what was contained in the deeds antedating the ownership of the entire property by Howard. In Gray *v.* Water Power Co. 85 Me. 526, it was said: "Water rights acquired by grant, and not by ownership of the soil through which the water flows, depend upon the intention of the parties as expressed in the deed, taken in connection with their situation and the subject-matter of their transaction at the time of conveyance."

In further illustration of this subject, it is said in 3 Farnham on Waters, 2274 (§ 753) : "The power which may be developed is dependent upon the height of the volume of water above the point of discharge which is termed the head, and upon the amount which is available for use, which is usually measured by what will pass through an aperture of given dimensions." In Gray *v.* Water Power Co., 85 Me. 528, it is said: "Grants and reservations relating to water and water-power are various in their nature and effect. Some refer to a certain extent of water-power sufficient for the propulsion of a specific mill or machinery. Warner *v.* Cushman, 82 Maine, 168; Hammond *v.* Woodman, 41 Maine, 177; Covel *v.* Hart, supra [56 Me. 518]; Elliott *v.* Shepherd, 25 Maine, 371. Some to a quantity of water to be restricted to a specific purpose. Deshon *v.* Porter, supra [38 Me. 293]. Others to 'such a quantity of water as the grantor or his predecessor have been accustomed to use.' Avon Manf'g Co. *v.* Andrews, 30 Conn. 476. Still others, to such a quantity of water as will flow through a gate of specific dimensions under a specific head of water. Bardwell *v.* Ames, 22 Pick. 333; Tourtellot *v.* Phelps, supra [4 Gray, 373]. Head is a well known material factor in determining the quantity of water which will pass through a given aperture in a given time. Em. Hydr. 38; Canal Co. *v.* Hill, 15 Wall. 94, 102." Various other forms of expression are also used in such grants. Sometimes the amount of water to be taken is referred to as so many square inches of water, referring to the size of the aperture. If the grant measures the water right by the aperture merely, it has been held that

it will not prevent a change of the head under which the water is delivered.    Gray *v*. Water Power Co., supra.    And it has also been declared that although a conveyance of a mill site and the right to a certain number of inches of water describes the lot by meets and bounds and fixes the river boundary of the lot at low-water mark, this does not limit the head of water-power so as to prevent the grantee from excavating his tail race below the then low-water mark.    Forrest Milling Co. *v*. Cedar Falls Mill Co., 103 Iowa, 619, 72 N. W. 1076.    Where the description is by the head and aperture or gate method, it is evident that both the head and the size of the aperture enter into a determination of the amount of water taken, and if a grant specifying only the size of the opening or gate does not place a limitation upon a change of head, it may well be doubted whether a specification of the head alone acts also as a limitation upon the size of the aperture or gate, at least unless the size of such opening operates to destroy the head stipulated for.

Perhaps we might content ourselves with stopping at this point; but as certain other questions have been urged in argument, it is not inappropriate that we should refer briefly to some of them.    It is contended that the petition shows the plaintiff to be entitled to the rights asserted by it, under the principle that whoever grants a thing is deemed also to grant that without which the grant itself would be of no effect.    This principle is undoubtedly sound and well established.    Familiar illustrations of its application are, where a man, having a close surrounded with his land, grants the close, the grantee shall have a way over the land as incident to the grant; and if one grants the fish in his pond, this includes the power to come upon the banks and fish for them; and where minerals are granted, it is presumed that they are to be enjoyed, and that the power to get them is also granted as a necessary incident. The rule, however, applies only to such things as are incident to the grant and directly necessary to the enjoyment of the thing granted.    So a way of necessity is limited by the necessity for it, and ceases with the termination of such necessity; and one to whom the fish in a pond have been granted, while having the right to take the fish by hooks, nets, or other devices, would not have the right to cut the banks of the pond for the purpose of draining it, and thus taking the fish.    Broom's Legal Maxims (7th Eng. ed.), 357, 360. In the present case the plaintiff alleges that it is in possession of

valuable water-power, and, "at such times as the flow of the river is in a normal condition and above, opposite the water lots, that ample power is afforded it to operate its machinery on the water lots it owns, without regard to the amount of water-power used by the defendant on its lot number 1;" and that it is only under abnormal conditions, occasioned by continued droughts, that it is affected. The allegations of the petition fail to show distinctly what Howard conveyed or what the plaintiff acquired by conveyances under him, and fail affirmatively to allege that the flow of water for which the plaintiff now contends was a necessary incident to any grant from Howard. Closely akin to, and to some extent overlapping the principle above referred to is another which it is urged applies to this case, namely, that the grant of real estate includes a grant of existing appurtenances and easements. In Wheeldon *v.* Burrows, 12 Ch. D. 31, 49; 48 L. J. Ch. 853, Thesiger, L. J., in a case involving the rights of the parties to the grant of part of a tenement, said: "I think that two propositions may be stated as what I may call the general rules governing cases of this kind. The first is that on the grant by the owner of a tenement of part of that tenement as it is then used and enjoyed, there will pass to the grantee all those continuous and apparent easements (by which, of course, I mean quasi easements), or, in other words, all those easements which are necessary to the reasonable enjoyment of the property granted, and which have been and are at the time of the grant used by the owner of the entirety for the benefit of the part granted." In a note to Mason *v.* Horton, 48 Am. St. R. 817 (67 Vt. 266), on page 821, the rule (or that branch of it applicable to a grant by an owner of the entire property) is thus stated: "Where the owner of an estate imposes upon one part an apparent and obvious servitude in favor of another, and at the time of the severance of ownership such servitude is in use, and is reasonably necessary for the fair enjoyment of the other, then, whether the severance is by voluntary alienation or by judicial proceedings, the use is continued by operation of the law." In 3 Farnham on Waters, 2267 (§ 747), it is said: "If the right to use power from a dam has been acquired and affixed to a particular mill or parcel of real estate, it will pass by a grant of the property of the grantor, with 'appurtenances.' But if the power was not an appurtenance of the property at the time of the grant, it will not pass as such, al-

though the grantor had a right to make use of the power at the time of the grant. A mere grant of the property will not create any appurtenances." See also, on this subject, United States v. Appleton, 1 Sumn. 492, Fed. Cas. No. 14463; Pray v. Great Falls Mfg. Co., 38 N. H. 442; Forrest Milling Co. v. Cedar Falls Mill Co., supra; *Towaliga Falls Power Co.* v. *McElroy,* 124 *Ga.* 1014; Hathorn v. Stinson, 10 Me. 224, supra; Gayetty v. Bethune, 14 Mass. 49, 7 Am. Dec. 190; Dexter Sulphite etc. Co. v. Frontenac Paper Co., 46 N. Y. Supp. 363.

It is contended that easements and things appurtenant pass by deed, though the word "appurtenances" may not be used, including what is in use for the land as an incident or appurtenance at the time of the conveyance. See Devlin on Deeds (2d ed.), § 863; 2 Am. & Eng. Enc. Law (2d ed.), 522, note 1; 14 Cyc. 1184; Gould on Waters (3d ed.), §§ 306, 307; 3 Farnham on Waters, §§ 777, 778. The difficulty with the petition under consideration is that it does not measure up to the rules on which the plaintiff relies. The allegations of the petition fail to show such an existing appurtenance or necessary incident at the time that Howard conveyed the lots now claimed by the plaintiff, or indeed at any time when a conveyance was made under which the plaintiff claims, as to meet the requirements of the rules of law invoked.

We do not deem it necessary to enter into a discussion of riparian rights which may be acquired by owners of land bordering upon artificial channels; nor the partition of water-powers owned in common; nor of rights which may be acquired in connection with manufactories located upon a canal or system for supplying water, created by authority of the legislature. (*City Council* v. *Lombard,* 93 *Ga.* 284.) The case made does not require it.

Viewed in the light of the principles above discussed, the plaintiff's petition does not show that it has the right alleged by it, and it was therefore demurrable. It is only necessary to add that the allegations as to damages are entirely too general and indefinite, if the petition could otherwise withstand the demurrer. It seeks not only injunction, but a recovery of damages. But its allegations on that subject are wanting in sufficient specification.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*