*Kobak & Levy, E. G. Jackson,* and *W. F. Buchanan,* for defendants.

## KITCHENS *v.* NOLAND *et al.*

No. 8012. APRIL 17, 1931. REHEARING DENIED MAY 16, 1931.

*Tye, Thomson & Tye,* for plaintiff in error. *Anderson, Rountree, Crenshaw & Hansell, Eugene M. Mitchell, Leon C. Greer, J. A. Watson, Hugh L. Luttrell,* and *McElreath & Scott,* for persons at interest, not parties of record.

*George S. Peck* and *Paul S. Etheridge & Son,* contra. *Walter W. Visanska, Frampton E. Ellis, A. C. Corbett, J. Walter Mason, Augustine Sams,* and *Morgan S. Belser,* for persons at interest, not parties of record.

HILL, J. On August 15, 1928, R. U. Kitchens bought a certain tract of land containing about two acres, which will be referred to

hereafter as the B. D. Watkins home place. The deeds in Kitchens' chain of title contain no restrictions as to the use to which the land can be put. After purchase, Kitchens began making preparations to erect an apartment-house and stores on the lot; whereupon S. C. Noland et al., owners of near-by lots, obtained an ex parte restraining order against defendant building on said lot. On interlocutory hearing the restraining order was dissolved, and an injunction was refused. The case was brought to the Supreme Court, where the judgment of the lower court was affirmed. *Noland* v. *Kitchens,* 169 *Ga.* 269 (149 S. E. 917). The record in the present case discloses in substance the following: In May, 1920; Thomas M. Clark owned about forty acres of land including the land in controversy. Clark sold fifteen acres of land adjoining, which did not include the land in controversy, to William Candler and B. D. Watkins. Candler and Watkins almost immediately had the land purchased of Clark surveyed and divided into eighty-eight lots for building purposes. They had plats of this land made and called it the "Linwood Subdivision." This plat was recorded in October, 1920. The plat showed in a general way the outlines of the land still owned by Clark, together with other surrounding land owned by others; but none of it was subdivided into lots except the fifteen acres which Candler and Watkins bought of Clark. Candler and Watkins executed to various purchasers deeds to these subdivided lots, putting in each deed certain restrictions with reference to the building lines, and prohibiting the building of certain kinds of business houses on said lots, and also the minimum value of the houses to be built thereon, and expressly prohibiting the use of the lots for apartment-houses and stores. In September, 1921, after most of the eighty-eight lots had been sold, B. D. Watkins (Candler not participating) bought the remainder of the Clark land which includes the property in controversy. Watkins built a home on the last tract purchased by him individually, of about two acres, and on December 17, 1921, conveyed this home place to his wife, Mrs. Susie Hunt Watkins, and her deed was duly recorded. Afterwards, while the title to the home place was in the wife of B. D. Watkins, and the title to the eighty-eight lots was in various purchasers, Watkins made plats from time to time, on three different dates, of portions of his acreage into building lots. Neither Watkins nor his wife made plats of the wife's two acres of land into smaller lots.

Watkins' plan of platting was to take the plat of the Linwood Subdivision made by Candler and Watkins of their adjoining tract and supplement it by adding a subdivision of a part of his own purchase. The first revised plat was recorded in March, 1922. On this plat there was no evidence or indication of any intention of platting any portion of the home place. That was left blank on the revised plat as undivided property having the same appearance on his revised plat as on the plat made by Candler and Watkins when it belonged to Clark. All the plats introduced in evidence containing the following: "Plat of Linwood Subdivision in the City of Atlanta, land lot 15, 14 Dist. William Candler and B. D. Watkins, owners. O. E. Kauffman, C. E. September, 1920."

Not all of these plats were made in September, 1920. The only plat made at that time was the plat of eighty-eight lots owned by Candler and Watkins. The other plats were made from time to time thereafter, as shown by the testimony of John A. White, from which the following appears: "The place that Mr. Watkins afterwards occupied as a home place was not a part of the first tract that he and Mr. Candler bought. That was a separate transaction. At the time Mr. Candler and Mr. Watkins together were laying off and subdividing, they only subdivided the land that they owned. After they finished that, and sold off a good many of the lots and saw that it was going to be a success, Mr. Watkins then bought the land to the south. . . I went down with him to inspect it. . . At that time there were already a good many homes in the Candler and Watkins tract. . . After Mr. Watkins purchased this land, he then began to lay off streets through it. . . Then he made these plats that have been shown me, other than the first one. . . He did not grade all of these streets through the new property and lay it off at one time. . . Mr. Candler and Mr. Watkins laid off streets in this part here which they bought together, but did not at that time grade out any streets in that Clark land; but when Mr. Watkins bought the Clark land by himself, he then laid off Linwood Place around here, which was at that time a narrow street. . . At the time he made that first plat he subdivided these lots, 102 to 108, and over on Williams Mill Road, 137 to 143, and then lots 99 to 101 on the other side of Linwood Place. . . Then, after he made that plat, we began to try to sell off those lots around on Linwood Place and Williams Mill Road.

. . Then later he made another plat in which he platted off some more lots on Williams Mill Road, from 119 to 129. . . This plat was recorded in Plat Book 9, page 18. . . Then he offered these lots 119 to 129 to purchasers, and put Forrest Road through. . . When he graded Forrest Road he subdivided the land fronting on Forrest Road and cut off into Forest Road a large part of that ravine. . . Then he made this plat which finished up dividing all of his property, except the home place. He never did subdivide the home place, but lived there until he died." John Gilmore, also employed by Watkins, testified: "When I first knew that tract, part of it was in woods; the eastern part had been subdivided into lots. . . I went with Mr. Watkins about the first of July, 1921. . . At that time Mr. Watkins had not begun developing the tract that he bought. . . The part that was in woods that had not been subdivided and streets opened out was the part that Mr. Watkins got from Mr. Clark. . . The part that he and Mr. Candler owned had already been subdivided and a great many of the lots sold. . . Up to that time the name 'Linwood' referred to the Candler and Watkins tract merely."

In June, 1925, Mrs. Watkins, her husband joining with her, executed a loan deed to the home place to Carolina Savings Bank, to secure a loan of $10,000, which deed *contained no restrictions*. On August 24, 1925, after Watkins had sold all his lots, Mrs. Watkins reconveyed the home place to Mr. Watkins, and on the following day he made a second loan deed to the Industrial Bank of Richmond. *None of these deeds contained restrictions.* Shortly thereafter Watkins died, and the second loan deed was foreclosed, and Kitchens, the defendant in the present suit, bought from the loan company the land which was purchased at the foreclosure sale. It does not appear from any of the deeds to the numbered lots, either in the Candler and Watkins tract, or in the Watkins tract, that there was any express agreement to put restrictions on the B. D. Watkins home place. It appears that Kitchens had a warranty title without restrictions of any sort. It will be seen, from the foregoing, that the original plaintiffs in this case were not all in the same position. Some of them were purchasers from Candler and Watkins, and certain of them were purchasers from Watkins alone, and it appears that the positions of those who purchased from Watkins differed among themselves, because their deeds

referred to different plats, certain of them to the first Watkins revision, and certain of them to the second Watkins revision, and some to the third. The lower court seems to have tried the case on the theory that it was a question of fact for the jury, as to whether or not all of the various plats referred to constitute one Linwood Subdivision with all lot owners as beneficiaries of all covenants, irrespective of date of their deeds, or the condition of their title at such date. But it is contended by plaintiff in error that as a matter of law the various subdivisions and plats made at different times, and on different properties of different owners, could not constitute one general scheme of restrictions. Of course when the eighty-eight lots purchased by Candler and Watkins from Clark were platted and sold, purchasers of those lots did not incur any obligation to the after-purchasers of the Watkins tract afterwards acquired from Clark. After these eighty-eight lots had been thus sold, Candler and Watkins could not impose any such obligation on the purchasers. As stated above, there was no express restriction in the defendant's deed, and there was no express covenant made by Watkins, so far as the record discloses, to any of the plaintiffs, agreeing to restrict the B. D. Watkins home place; and the insistence of learned counsel for the defendants in error is, as we understand it, one of *implied covenant*. The usual implied covenant is based on an actual pre-existing plat and subdivision, on the theory that the fact of making the plat, and formulating a set of restrictions alike to all lots of the subdivision, shows an existing intention to restrict all alike, and the law in such circumstances implies a covenant to carry out the scheme thereafter created and evidenced by the plats under which the property was sold and purchased.

Plaintiff in error admits the correctness of the rule laid down in 15 C. J. 1218, cited by this court in *Phillips* v. *Ingram*, 163 *Ga.* 580 (136 S. E. 785), as follows: "It has been held, however, that restrictions under a general plan adopted by the owner to sell lots may in equity be imposed on the land beyond the express restrictions contained in the deed to the purchaser, on the theory of implied covenants." But it is insisted that when the foregoing rule is applied to the facts of this case, no right to restrictions is made out in favor of any one or more of the plaintiffs, for the reason that B. D. Watkins never did adopt a general plan with reference to his

entire purchase; that he merely made plats from time to time of small portions thereof, as evidenced by the various plats and the various changes he made in the location of streets, etc., from time to time; and that if Watkins did in fact adopt a general plan, it is not binding, because he was not the owner of the home place at the time of the adoption of such general plan, nor was he then the owner of the first eighty-eight lots which had been previously disposed of. It thus appears that the original Candler and Watkins general scheme, with reference to their subdivision, did not in any way apply to the Clark land which had not been purchased by them, and which was not subdivided until some time afterwards, and purchasers did not acquire any rights or incur any duty in respect of the Clark land. As a general rule, owners of the fee in land have the right to use their property for apartments and stores, if they so desire; and any claim that they are restricted in such use of their property must be clearly established and strictly construed. *Randall* v. *Atlanta Adv. Service,* 159 *Ga.* 217 (125 S. E. 462). Defendant in error is, in effect, claiming certain rights over the B. D. Watkins home place by implication; but estates and grants by implication are not favored, and should be strictly construed. Civil Code (1910), § 4268 (7); *Muscogee Mfg. Co.* v. *Eagle & Phenix Mills,* 126 *Ga.* 210 (3) (54 S. E. 1028, 7 L. R. A. (N. S.) 1139). In the absence of express covenant, Watkins can not be presumed to intend a covenant restricting land belonging to Clark, or to his wife. In *Simms* v. *Freiherr,* 100 *Ga.* 611 (28 S. E. 288), it was stated: "It is a well-settled principle of law that one who purchases from another having no title acquires none, though the purchase be for value and without notice. . . It is equally true that where one accepts a lien upon property to secure the payment of a debt to which the debtor had no title, no incumbrance rests upon the property." And if one who does not own property can not expressly convey or incumber it, the law will not imply that he has made a covenant with reference to its use.

Tested by the foregoing rules, the plaintiffs in this case are not entitled to enforce the restrictions against the defendant, Kitchens, who holds under a chain of title that contains no restrictions, and for the reason that Watkins did not in the beginning, before the conveyance to his wife, make one general scheme for all of his undivided property purchased from Clark, but on the contrary made

several partial schemes. Before he had filed his first plat, he had conveyed the B. D. Watkins home place to his wife, and he was not, at the time of filing any of the plats or making any of the deeds except lot 98, the owner of that place. Not only this, but in none of the plats he made and had recorded did he attempt to divide the B. D. Watkins home place, or to give any lot number with reference thereto; and while he indicated a building line on it in the first plat, he afterwards, when he opened Forrest Road and platted lots on that road, expressly omitted any building line from the home place, thus indicating his intention to differentiate the home place from the numbered lots.

So we reach the conclusion, after long and careful study of this record, that under the facts of this case the evidence did not authorize the verdict, and consequently that the court erred in overruling the motion for new trial on the general grounds. The foregoing principles are controlling in this case; and consequently the rulings of the trial court on admissibility of evidence, the charge to the jury, and refusal to charge where proper and applicable, being contrary to the foregoing principles, it was error to admit such evidence, and to charge as the court did, and to refuse to charge as requested. *Judgment reversed. All the Justices concur.*